BROWN & ALLEN *et al. v.* JACOBS' PHARMACY CO.

115  429
120  426

115  429
c122  512
122  520

115  429
126  261

1. A combination of mercantile dealers to compel another dealing in similar goods to sell at prices fixed by it, or, upon his refusal so to do, to prevent those of whom its members are purchasing customers from selling goods to him, is, upon general legal principles, contrary to public policy and void; and the members of such a combination may, collectively or individually, be, by appropriate injunction, restrained from carrying into effect such purpose as that indicated above.

2. The act approved Dec. 23, 1896 (Acts 1896, p. 68), commonly known as the "anti-trust act," is unconstitutional, as section 4 thereof, declaring that the provisions of the act "shall not apply to agricultural products or live stock while in the possession of the producer or raiser," makes the act repugnant to that provision of the fourteenth amendment of the constitution of the United States which declares that "No State shall deny to any person within its jurisdiction the equal protection of the laws."

3. There was no error in granting the injunction prayed for, save only as to one of the defendants; and the judgment excepted to being as to all the others. correct, it will be affirmed, with appropriate direction.

Argued February 22, — Decided April 30, 1902.

Injunction. Before Judge Lumpkin. Fulton superior court. September 16, 1901.

*King & Spalding* and *Smith, Hammond & Smith,* for plaintiffs in error.

*Hamilton Douglas, Rosser & Carter, Hopkins & Sons,* and *Arnold & Arnold,* contra.

FISH, J. The record in this case discloses that, prior to the institution of the present action and since then there existed in the United States three organizations, known respectively as the Proprietary Association of America, the National Wholesale Druggists Association, and the National Association of Retail Druggists. These associations, occupying each toward the others close and intimate relations, had, among other things, the purpose of keeping up the prices of proprietary medicines, drugs, and other articles usually dealt in by those engaged in the drug trade. A local association was formed in Atlanta, known as the Atlanta Retail Druggists Association. When it was first organized, Joseph Jacobs, secretary and treasurer of the Jacobs' Pharmacy Co., the plaintiff in the present case, was a member of it, but at that time it was distinctly understood and agreed among its members that it was to undertake no action with reference to the cutting of prices by deal-

ers in drugs, or to control prices of the same. Afterwards the plaintiff, either by its methods of advertising, or certain things that it did in the conduct of its business, gave offense to the members of this association, and charges were preferred against Jacobs. He then withdrew from the local association. Some of the members of that association were members of one or more of the large associations above referred to. After the retirement of Jacobs, the local concern put in operation a scheme to prevent the Pharmacy Co. from being able to buy goods with which to conduct its business. The main features of that scheme were, that the local concern, by circulars, letters, or otherwise, undertook to notify wholesalers and manufacturers throughout the country that the Pharmacy Co. was an aggressive cutter, and to request the persons or concerns addressed not to sell it any more goods; further, to require all salesmen representing the manufacturers or wholesale houses to procure from the local association a card, in order to procure which such salesmen had to sign an agreement not to sell the Pharmacy Co. any goods; and another part of the scheme was to give the manufacturers and wholesalers to understand that, unless they refused to sell the plaintiff any goods, the members of the local association would not buy any more goods from them. In this condition of affairs the plaintiff brought its equitable petition against the defendants, alleging, in substance, the facts set forth above, and praying for damages for alleged injuries to its business already done, and for an injunction to prevent the defendants from carrying into effect the scheme above outlined. The petition charged that the scheme was an unlawful conspiracy to destroy the plaintiff's business; and it more fully set out the manner in which this scheme was to be effectuated, by setting forth, as exhibits marked, A, B, and C, certain letters, etc., by means of which the defendants were seeking to accomplish the alleged unlawful purpose which the plaintiff was seeking to restrain. These exhibits were as follows:

"Exhibit A.

"Atlanta, Ga., March 28, 1901.

"C. L. Stoney, President.    W. B. Freeman, Vice-President.

"R. L. Palmer, Treasurer.    W. S. Elkin Jr., Secretary.

"Atlanta Druggists Association.

"Gentlemen, — Inclosed please find a copy of a resolution recently adopted by the Atlanta Druggists Association. There are

fifty-eight retail druggists and three wholesale druggists in this city, and among this number only one, a retailer, is designated as an aggressive cutter. Believing that from a business standpoint you would prefer the aid and support of fifty-eight (two of the wholesalers are also retailers) legitimate druggists rather than that of one cutter, we feel sure that it will afford you pleasure to sign the enclosed agreement. Awaiting an early reply, I am

Yours very truly, W. S. Elkin, Secretary."

"Exhibit B.

"We, the undersigned, hereby agree to sell goods of our manufacture (or manufactured by any other house that we may handle) in the city of Atlanta, Ga., and adjoining districts, only to those druggists who are members of the Atlanta Druggists Association, and any others who have not been designated as aggressive cutters. We further agree not to sell any goods to department stores in the above-mentioned territory. We reserve the right to cancel this contract by giving notice to the secretary of Atlanta Druggists Association. Date . . . . . . . . . : . . ."

"Exhibit C.

"A copy of resolution adopted by the Atlanta Druggists Association, March 22nd, 1901.

"Resolved : 1. That the Atlanta Druggists Association adopt a card for salesmen reading :

This is to certify that Mr. . . . . . . . . . . . . . representing . . . . . . . . : . . . . . . . . . has qualified, and is hereby recommended to the members of our association.

Date . . . . . . . .  . . . . . . . . . Secretary.

(This card is only good for 30 days from date.)

"2. That salesmen's cards shall be required of all salesmen representing as follows : Drug jobbers, patent medicine manfgrs., pharmaceutical houses, proprietary medicine manufacturers, druggist's sundry houses who carry patent and proprietary medicines, proprietary articles and medicated soaps, manufacturers of surgical supplies, and manufacturers of paper boxes and labels.

"3. That the secretary shall issue cards only to salesmen who sign an agreement not to sell directly or indirectly any aggressive cutter, or any department store. This agreement to be binding to house represented by salesmen signing same.

"4. That where new remedies are being introduced, the sales-

men require each purchaser to sign contract to sell such remedy at full printed or implied price.

"5. That a copy of these resolutions be furnished each manufacturer who is requested to sign agreement."

The case was heard before Hon. J. H. Lumpkin, judge of the Atlanta circuit, upon the application for an interlocutory injunction. A considerable amount of evidence was introduced, concerning which it is sufficient to say that the plaintiff established, substantially, the material allegations of its petition. It claimed an injunction both upon the general principles of the common law and also under the terms of what is commonly known as the anti-trust act passed by the General Assembly of this State in 1896. The defendants attacked the constitutionality of that act, alleging that it is in violation of the fourteenth amendment of the constitution of the United States, in that it denies to them the equal protection of the laws, and deprives them of liberty and property without due process of law, and also abridges their liberties and immunities as citizens of the United States; that it is class legislation and violates article 1, section 4, paragraph 1, of the constitution of Georgia. The judge granted the injunction substantially as prayed. After a careful investigation, we are satisfied that he was right in so doing, except in so far as it was made operative against the Lamar-Rankin Drug Co., one of the defendants, which was not a member of the local association mentioned above, and against which, therefore, no injunction should have been granted. This minor error or inadvertency has been corrected by an appropriate direction in the judgment rendered by this court. It would not be profitable to set out, or even summarize, the voluminous evidence which was introduced at the hearing. We have already, in effect, stated that the evidence was sufficient to establish favorably to the plaintiff its contentions of fact. We shall, therefore, confine our discussion to the questions of law involved in the present writ of error. Their nature will be gathered from what has already been said, and from an examination of the headnotes preceding this opinion. We have been relieved of much labor by reason of the fact that the learned and able judge of the trial court filed in the case an elaborate and carefully prepared opinion. What follows is taken almost literally from the same. We omit, save as to extracts from authorities made by him, the use of quotation marks, for the sake of convenience, as we have seen fit to make some omissions, changes, and ad-

ditions as to the several propositions stated and discussed by his honor. It is but fair, however, to add that the material which we have rendered available was all supplied by the work done by the judge below.

A conspiracy has been defined as a combination either to accomplish an unlawful end, or to accomplish a lawful end by unlawful means. This form of expression was used by Lord Denman in Rex *v.* Seward (1834), 1 Adol. & E. 706; Jones's case (1832), 4 B. & Ad. 345. And though he is reported to have expressed himself somewhat differently in other cases (see passing remark in Reg *v.* Peck (1839), 9 Adol. & E. 686), this definition has been very widely accepted and quoted. See Bouv. L. D. "Conspiracy." Mr. Eddy, in his recent work on Combinations, gives the following definition as comprehensive in its nature and including both civil and criminal conspiracies: "Conspiracy is the combination of two or more persons to do (*a*) something that is unlawful, oppressive, or immoral; or (*b*) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; (*c*) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means." 1 Eddy, Comb. §§ 171, 340. Conspiracies are often spoken of as civil or criminal. The terms "criminal" and "civil" are used respectively to designate a conspiracy which is indictable, or a conspiracy which will furnish ground for a civil action. To render a conspiracy indictable at common law, no overt acts in carrying out the design of the conspirators were necessary. The conspiring was sufficient to authorize an indictment. Yet it will be readily perceived that, if the conspirators stopped with conspiring, and did nothing further in execution of the design, no injury would have been done which would furnish a basis for a civil action. But if, in carrying out the design of the conspirators, overt acts were done, causing legal damage, the person damaged had a right of action. Saville *v.* Roberts, 1 Ld. Raym. 378. Hence arose the dictum that the gist of criminal conspiracy is the combination, and the gist of civil conspiracy is the injury or damage. And from this came certain rulings, applicable to the two respectively, which need not be discussed. Mr. Eddy says, "The law of civil conspiracy is a wider development and application of the law of criminal conspiracy. So far as rights and remedies are concerned, all criminal conspiracies are embraced within civil conspiracies — the definition

of the latter embraces the former." 1 Eddy, Comb. § 364. That contracts and agreements in general restraint of trade are contrary to public policy and void, is a principle so universally recognized that citation of authority is unnecessary to support it. It has been crystallized in the Civil Code of this State, § 3668, where the expression is that contracts "in general restraint of trade" are contrary to public policy. Differences of opinion arise only when this general principle is to be applied to a particular case. Thus it is suggested, inasmuch as the evidence shows that not all of the druggists of Atlanta are members of the local association, but only about three fourths of them, that the combination or agreement was not obnoxious to this rule, or the rule declaring agreements or contracts tending to monopoly, against public policy, even if it would have been so were all members. We do not think this distinction sound. Nothing is more common than for the courts to declare contracts between only two persons, who by no means control a particular kind of business, void as contrary to public policy. It is the nature or character and tendency of the agreement which renders it objectionable, whether in fact the parties to it succeed in restraining trade generally, or stifling competition, or not. As to the matter of monopoly, it may also be said that if parties make contracts or agreements seeking to establish a monopoly, and do establish it as far as they can, surely they can not say that the effort is legal if not completely successful.

In Moore *v.* Bennett (Ill. 1892), 15 L. R. A. 361, it was held that an association of stenographers of which one object was to control the prices to be charged for stenographic work by its members, by restraining all competition between them, was an illegal combination, although only a small portion of the stenographers of the city belonged to it. In the opinion Bailey, J., says (p. 364) : "Contracts in partial restraint of trade which the law sustains are those which are entered into by a vendor of a business and its good will with his vendee, by which the vendor agrees not to engage in the same business within a limited territory, and the restraint, to be valid, must be no more than is reasonably necessary for the protection of the vendee in the enjoyment of the business purchased." To this has sometimes been added agreements of partnership or employment. Mr. Tiedeman says: " Following the reason of the rule which prohibits contracts in restraint of trade, we find that it is

made to prohibit all contracts which in any way restrain the free-dom of trade or diminish competition, or regulate the prices of commodities or services." Tied. Com. Paper, § 190. In Anderson v. Jett (Ky. 1889), 6 L. R. A. 390, 392, it was held: "Rivalry is the life of trade. The thrift and welfare of the people depend upon it. Monopoly is opposed to it all along the line. . . The combination or agreement, whether or not in the particular instance it has the desired effect, is void. The vice is in the combination or agreement. The practical evil effect of the combination only demonstrates its evil character; but if its object be to prevent or impede free and fair competition in trade, and may in fact have that tendency, it is void as being against public policy." See also Texas Standard Oil Co. v. Adove (1892), 83 Tex. 650, 19 S. W. 274; People v. Sheldon, 139 N. Y. 251, 263, 264. Under such circumstances the agreement is void, although the prices fixed at the time may have been reasonable. India Bagging Association v. Kock & Co., 14 La. Ann. 168.

Judge Taft, in the Circuit Court of Appeals of the Sixth Circuit of the United States, in an able decision in the case of United States v. Addystone Co., 85 Fed. R. 271, 46 L. R. A. 122 et seq., reviews the authorities on this subject. Among other things he says (46 L. R. A. 131): " Much has been said in regard to the relaxing of the original strictness of the common law in declaring contracts in restraint of trade void, as conditions of civilization and public policy have changed; and the argument drawn therefrom is that the law now recognizes that competition may be so ruinous as to injure the public, and therefore that contracts made with a view to check such ruinous competition, and regulate prices, though in restraint of trade, and having no other purpose, will be upheld. We think this conclusion is unwarranted by the authorities, when all of them are considered. . . The manifest danger in the administration of justice according to so shifting, vague, and indeterminate a standard would seem to be a strong reason against adopting it." After considering a number of authorities, he says (p. 136): " In the foregoing cases the only consideration of the agreement restraining the trade of one party was the agreement of the other to the same effect, and there was no relation of partnership, or of vendor and vendee, or of employer and employee. Where such relation exists between the parties, as already stated, restraints are usually

enforceable, if commensurate only with the reasonable protection of the covenantee in respect to the main transactions affected by the contract. But, in recent years, even the fact that the contract is one for the sale of property, or of business and good will, or for the making of a partnership or a corporation, has not saved it from invalidity, if it could be shown that it was only part of a plan to acquire all the property used in a business by one management with a view to establishing a monopoly. . . Upon this review of the law and the authorities, we can have no doubt that the association of the defendants, however reasonable the prices they fixed, however great the competition they had to encounter, and however great the necessity for curbing themselves by joint agreement from committing financial suicide by ill-advised competition, was void at common law, because in restraint of trade, and tending to a monopoly." This exactly answers one of the arguments advanced in the present case. It is contended that the members of the Atlanta Druggists Association were not seeking to restrain trade, or create any monopoly, but were only seeking to defend themselves against the cutting of prices by the Jacobs' Pharmacy Company, and that really they were fighting an effort at monopoly. That fifty-eight druggists in the city of Atlanta should seriously claim to be in danger of a monopoly from one, which is not shown to have any more capital than any of them, or any more facilities for trade, or to be making any combination, or in fact doing anything to cause the present action on their part, except selling some articles of merchandise at low rates, is a position which can not be sustained. This is the argument which is almost universally advanced by every monopoly or combination in restraint of trade. If it is sustained by the courts, then the rules of law as to such contracts and agreements might as well be wiped off the statute books.

The decision just cited was affirmed by the Supreme Court of the United States (in 1899), except as to one mere inadvertence in respect to interstate commerce. In the decision the following is quoted approvingly from the opinion of Judge Taft: "It has been earnestly pressed upon us that the prices at which the cast-iron pipe was sold in 'pay' territory was reasonable. . . We do not think the issue an important one, because, as already stated, we do not think that at common law there is any question of reasonableness open to the courts with reference to such a contract. Its ten-

dency was certainly to give defendants the power to charge unreasonable prices, had they chosen to do so." 175 U. S. 211, 237.

Again, some courts have sought to draw a distinction between what they term "necessaries" or "the necessaries of life," or "prime necessaries," and contracts or agreements with reference to other articles of commerce or merchandise. But this distinction is not well founded. What is at one time a luxury at another is a necessity. The things which were considered sufficient to satisfy the description of "necessaries" a few years ago would be considered wholly insufficient now, under present conditions of civilization. How useful must a thing become before it enters the catalogue of necessaries, so that contracts to restrain trade in regard to it, or to foster a monopoly in it, are void? The unsoundness in principle of such a distinction was treated of by Judge Taft in the case of Addystone Co., already referred to. But if it were sound, it may be of interest to consider some of the articles which have been held of such necessity. In a note to be found in 74 Am. St. Rep. 268, 269, to the case of Harding v. American Glucose Co., the following are set out as having been held of such necessity as to make a combination in regard to them illegal: beer, alcohol, distilling products, preserves, gas-pipes, powder, harrows, capsules, envelopes, wire cloth, bluestone, cigarettes, etc. Now, if these articles are to be ranked as necessaries within the rule, it might as well be said at once that the rule applies to articles of merchandise generally.

The next position of the defendants, and the one which, on first presentation, seems to be their strongest defense on this part of the case, is that, at common law, contracts or agreements in general or unreasonable restraint of trade were merely void and unenforceable; that either party could defend against an action based on them; but that they were not illegal in such sense as to give a right of action to third parties. While there may be conflict among the authorities, it seems to us that some confusion might have been avoided by bearing in mind the distinction between a contract or agreement merely in restraint of trade as between the parties, and a combination or contract to stifle competition, or a conspiracy to ruin a competitor. Thus if one of two rival merchants, not purchasing the business of the other, contracted with him that the latter should cease business and never enter mercantile pursuits at any time or place, the contract would be in general

restraint of trade, and void, and could not be enforced. But it alone would not give a right of action to third parties; and although the retiring from business of one of the merchants might lessen facilities for trading, and incidentally cause inconvenience, or even put it in the power of the other to raise his prices, the contract as such would merely be void. But, on the other hand, suppose that two merchants should agree that one should retire from business and that no other person should open a similar business, and if he did so, that the two would drive away his customers or break up his business by violence, threats, or like means, it would get beyond the domain of a mere non-enforceable contract into the domain of a conspiracy. Or suppose that a number of merchants should agree to fix the price of certain goods and not to sell below that price, if there were no statute on the subject, and the case rested on the common law, the agreement would simply be non-enforceable; but if they went further and agreed that, if any other merchant sold at a less price, they would force him to their terms or drive away those dealing with him, by violence, threats, or boycotting, it would cease to be a mere non-enforceable contract; and if in its execution damages proximately resulted to such other merchant, he would have a right of action. For two or more people to make an agreement which neither can enforce at law against the other is one thing; but to further agree, and under that agreement proceed to force another who is no party to it, against his will, to be governed by it, under penalty of financial ruin by driving off his customers, or the like, is, to use a favorite expression of former Chief Justice Warner, " another and quite a different thing." There is no inherent wrong in the mere act of firing a pistol in a place where not prohibited by law, but it may become very wrong if it is fired at the person or property of another, and may give a right of action to him for resulting injury. A combination, like a revolver, should not be aimed maliciously or with a reckless disregard of the rights of others.

Doremus v. Hennessy, 176 Ill. 608, 43 L. R. A.797, was an action on the case for damages, on the ground that the members of an organization known as the Chicago Laundrymen's Association had fixed a scale of prices for laundry work, and had conspired to injure the plaintiff in her good name and credit, and to destroy her business, because she would not charge prices in accordance with such

scale, and they were proceeding to carry out the conspiracy. It was held actionable. The court said: "A combination by them to induce others not to deal with appellee or enter into contracts with her, or to do any further work for her, was an actionable wrong. Every man has a right, under the law, as between himself and others, to full and free disposition of his own labor and capital, according to his own will, and any one who invades that right without lawful cause or justification commits a legal wrong; and if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong. . . An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the right of another, it is malicious, and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition." Boutwell v. Marr (Vt. 1899), 43 L. R. A. 803, 805, was an action for damages. An association of granite manufacturers prohibited, by resolutions, sales by its members to persons engaged in cutting, quarrying, or polishing granite in the New England States, New York City, and Vermont, who were not members, which enumeration included plaintiffs. There was a by-law which prohibited dealing with members not in good standing, and imposed fines for the violation of its rules. The defense did not concede that such a by-law was more coercive than to attempt to compel by threats or intimidation persons not members of the association to withdraw their patronage from plaintiffs, but contended that the by-law was less objectionable, because applying to members only. The court held both to be alike unlawful. It said (p. 805): "Without undertaking to designate with precision the lawful limit of organized effort, it may safely be affirmed, that when the will of a majority of an organized body, in matters involving the rights of outside parties, is enforced upon its members by means of fines and penalties, the situation is essentially the same as when unity of action is secured among unorganized individuals by threats or intimidation. The withdrawal of patronage by concert of action, if legal in itself, becomes illegal when the concerted action is procured by coercion. . . It is clear that if the association had comprised but a small portion of the manufacturers, and had destroyed the plaintiff's business by compelling the manufacturers to join them in withholding patronage, the members would have been liable." In Inter-Ocean Publishing Co. v.

Associated Press (Ill. 1900), 56 N. E. 822, 826, an injunction was granted. The court said: "Competition can never be held hostile to public interests, and efforts to prevent competition by contract or otherwise can never be looked upon with favor by the courts." In People v. Chicago Live Stock Exchange, 170 Ill. 556, 48 N. E. 1062, 39 L. R. A. 373, it is said: "Efforts to prevent competition and to restrict individual efforts and freedom of action in trade and commerce are restrictions hostile to the public welfare, not consonant with the spirit of our institutions, and in violation of law." Similar language is used in the case last above cited. 56 N. E. 826. In Beck v. Railway Teamsters' Pr. Union (Mich. 1898), 42 L. R. A. 407, an application for injunction was sustained. The court said (p. 418): "The boycott condemned by the law is not alone that accompanied by violence and threats of violence, but that where the means used are threatening in their nature, and intended and naturally tend to overcome by fear of loss of property the will of others, and compel them to do things which they would not do otherwise."

State v. Stewart, 59 Vt. 273, 59 Am. Rep. 710, arose on a demurrer to an indictment. In the opinion Powers, J., said (p. 713): "The reports, English and American, are full of illustrations of the doctrine that a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, whether such purpose be illegal at common law or by statute; or to effect a legal purpose by illegal means, whether such means be illegal at common-law or by statute, is a common-law conspiracy. Such combinations are equally illegal, whether they promote objects or adopt means that are per se indictable; or promote objects or adopt means that are per se oppressive, immoral, or wrongfully prejudicial to the rights of others. . . . The anathemas of a secret organization of men combined for the purpose of controlling the industry of others by a species of intimidation that works upon the mind rather than the body, are quite as dangerous, and generally altogether more effective, than acts of actual violence." In Carew v. Rutherford, 106 Mass. 1, 10, Chapman, J., after giving various illustrations of actionable wrongs, says: "But as new methods of doing injury to others are invented in modern times, the same principles must be applied to them, in order that peaceable citizens may be protected from being disturbed in the enjoyment of their rights and privileges, and existing forms of remedy must be used."

In Gatzow v. Buening (Wis. 1900), 81 N. W. 1003, it was held that damages were recoverable. It is true that a contract had been made; but the decision was not put on that ground, but on the broader ground that the conduct of the defendants constituted an actionable conspiracy. Marshall, J., said (p. 1007): "This is an age of trusts and combinations of all sorts. There is clamor against them on the one hand, and for the privilege of combining upon the other, as if the law could be changed to fit the opinions and selfish ends of particular classes. There is clamor for laws to prevent combinations, while law exists that condemns most of them, which is as old as the common law itself, and sufficiently severe to remedy much of the mischiefs complained of that is actual; yet violations of such law are so common, and the remedy it furnishes so seldom applied, that its very existence seems in many quarters to be little understood. In Reg. v. Druitt, 10 Cox's Cr. Cas. 593, it was held that any combination of persons to stifle and prevent the free use of labor and capital within legitimate bounds is unlawful, and that the law furnishes a remedy therefor. The liberty of a man's mind and will to say how he shall bestow himself and his means, his talents, and his industry, is as much the subject of the law's protection as is his body. A combination to do an act tending necessarily to oppress the public or oppress individuals by unjustly subjecting them to the power of the confederates and give effect to the purpose of the latter, whether of extortion or mischief, is unlawful. Bish. Cr. L. § 177; Desty, Cr. L. § 2; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173. Every agreement between two or more persons to accomplish a criminal or unlawful object, or a lawful object by criminal or unlawful means, is an unlawful conspiracy, and any person whose rights are injured by acts done in furtherance of such conspiracy has his action at law for redress in damages." In Olive v. Van Patten (1894), 7 Tex. Civ. App. 630, 25 S. W. 428, where a petition alleged that defendants, who were lumber-dealers, had formed an association and sought to prevent sales by manufacturers or wholesale dealers to any person not a dealer, except a railroad, at points where there was a dealer; that because of the refusal of the plaintiff—a sawmill owner and dealer who was not a member—to join such association and his exercising the right to sell to others than dealers, they had maliciously distributed circulars asking that patronage be withdrawn from the plaintiff un-

til he agreed not to sell to others than dealers, thereby influencing others not to deal with plaintiff, to his injury, it was held to state a good cause of action for damages and injunction.    In Barr *v.* Essex Trades Council (1896), 53 N. J. Eq. 101, an injunction was granted, and an able opinion filed by Green, V. C.    In Jackson *v.* Stanfield (1894), 137 Ind. 592, 23 L. R. A. 588, it was held that a combination of retail lumber-dealers to destroy the business of brokers and commission dealers who did not keep a lumber-yard with an assorted stock of lumber, by coercing wholesale dealers to refuse to make sales to such brokers or lose the business of the members of such combination, was unlawful, and rendered a member who procured action by the association, to the injury of brokers, liable to the latter. in damages; also that an injunction might be granted against enforcing an illegal agreement of dealers to injure the business of another person.    See also Lucke *v.* Clothing Cutters (1893), 77 Md. 397; Civil Code, § 3807; *Witham* v. *Cohen,* 100 *Ga.* 670.

Courts and text-writers have not infrequently asserted that, as a general rule, a conspiracy can not be made the subject of a civil action unless something is done, which, without the conspiracy, would give a right of action.    But if this be advanced as a rule of universal application, it does not stand unchallenged.    In Bailey *v.* Association (1899), 103 Tenn. 117, 52 S. W. 853, 857, it is said: "It is entirely true, as in effect observed in McCauley *v.* Tierney, 19 R. I. 255, 33 Atl. 1, and in Manufacturing Co. *v.* Hollis, 54 Minn. 223, 55 N. W. 1119, that, in the first instance, each member of the association had a perfect legal right to buy material and supplies exclusively from any dealer or dealers he might choose, and each dealer had an equal right to select members for his customers, and to confine his sales to them only.    These were inherent rights, which no competitor was authorized to dispute, no court empowered to control or curtail.    But, in our opinion, it does not follow from this undoubted freedom of individual member and of individual dealer that all of the members may, as ruled in those cases, lawfully enter into a general and unlimited agreement, in the form of by-laws, that they and all of them will make their purchases from only such dealers as will sell to members exclusively. The premise does not justify the conclusion.    The individual right is radically different from the combined action.    The combination has hurtful powers and influences not possessed by the individual.

It threatens and impairs rivalry in trade, covets control in prices, seeks and obtains its own advancement at the expense and in the oppression of the public. The difference, in legal contemplation, between individual rights and combined action in trade is seen in numerous cases. Any one of several commercial firms engaged in the sale of India cotton bagging had the right to suspend its sale for any time it saw fit. Yet an agreement between all of them to make no sales for three months without the consent of the majority 'was palpably and unequivocally a combination in restraint of trade.' Association v. Kock, 14 La. Ann. 168. Any one of several companies had the right to sell the whole or only a part of its output to only such persons, in only such territory, and at only such prices as it pleased, yet it was inimical to the interests of the public and unlawful for them to combine and agree that those matters should be determined and controlled by an agency jointly created for that purpose. Arnot v. Coal Co., 68 N. Y. 558; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173. The same was held to be true as to the individual company and the combined companies, respectively, in the Sugar-Trust case, previously cited, 3 N. Y. Supp. 401, and 7 N. Y. Supp. 406. So one railroad company has the unquestioned right to charge reasonable rates for transportation, but it is not lawful for competing companies to mutually bind themselves to maintain those rates. U. S. v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540; U. S. v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25. Individual boat proprietors may establish rules and rates for the conduct of their separate business, but the law does not allow them to form a combination, and by mutual agreement establish joint rules and rates. Hooker v. Vandewater, 4 Denio, 349; Stanton v. Allen, 5 Denio, 434. One grain dealer is perfectly free to decide for himself what price he will offer for grain, but he is not allowed to enter into an agreement with the other grain dealers of his town, and thereby fix the price that all of them shall offer. Craft v. McConoughy, 79 Ill. 346. A single brewer may fix his own price for the beer he sells. Nevertheless it is unlawful for an association of brewers to regulate the sales of its members. Nester v. Brewing Co., 161 Pa. St. 473, 29 Atl. 102. Many other cases to the same effect in principle might easily be cited, were their citation deemed at all necessary."

Unquestionably any person who does not occupy a public or

quasi-public position (like public officials, railroad companies, etc.), or whose property has not become impressed with any public or quasi-public use (Munn *v.* Illinois (1876), 94 U. S. 113), may ordinarily deal with any other person at his option. It may also be conceded, at least for the sake of the argument, that ordinarily a number of persons may in concert decline to sell to or buy from another. Yet the facts of the present case go much further than that. Here there was a combination, not merely agreeing not to deal with the plaintiff, but undertaking also to drive off and prevent others from dealing with it, and seeking to ruin its business by destroying its power to purchase goods, unless it should submit to regulate its business or fix its prices as they desired. If the defendants as individuals, or in any way, claim to have the right to fix the prices at which they will sell, how can they claim that plaintiff has no such right as to its own business? In Boutwell *v.* Marr, supra, the Supreme Court of Vermont said that the view above referred to " would preclude a reliance upon an unlawful purpose, and require that the means used should be illegal. The agreeing together to effect an illegal purpose being itself illegal, it might seem that any act done in furtherance of the agreement, and resulting in damage, even though itself not a violation of right, would sustain a recovery. . . If it be true, as a general proposition, that several may lawfully unite in doing to another's injury, even for the accomplishment of an unlawful purpose, whatever each has a right to do individually, it by no means follows that the combination may not be so brought about as to make its united action an unlawful means." See also Barr *v.* Trades Council, supra; the strong opinion of Gibson, C. J., in Com. *v.* Carlisle, Brightly, N. P. (Penn.) 36, 41 (quoted at some length in one of the opinions in Knight's case, 156 U. S. 35); State *v.* Geiddert, 55 Conn. 46, 75; and cases cited in 1 Eddy, Comb. § 360. Certain portions of the annual address (in 1899) of the president of the National Association of Retail Druggists, as published in the American Druggist and Pharmaceutical Record, were introduced in evidence, from which it appears that, in discussing the power of combination as compared with individual effort, he said: " Nature too forgets the individual always; to the species alone is it kind ; in the general uplifting alone does it glory. So must it be with man. Man is of nature and must follow nature's bent. This tendency to associate, to unite, to combine, every-

where present, strangely active, is as resistless as is yonder great Niagara. Attempt to oppose it and it spreads far and wide. Spreads with the opposing force, all the while accumulating power until everything, even the mightiest, is swept before its immensity." And yet, when such mighty power, like a torrent, is turned upon any individual who declines to join, or to do the bidding of, those who direct the force, and to sell at prices dictated by them, for the purpose of crushing him and driving off those who would deal with him, under the threat that otherwise they will also be drowned in the resistless Niagara, shall courts of justice find no remedy? To protect the individual against encroachments upon his rights by greater power is one of the most sacred duties of courts. If there is any analogy between a combination of druggists to raise and maintain prices, and a biological species, the Darwinian theory is hardly a rule for a court in administering equity. In contrast with this idea, the following vigorous language of Mr. Justice Bradley in the Slaughter-House Cases, 16 Wall. 116, may be quoted: " For the liberty, preservation, exercise, and enjoyment of these rights [life, liberty, and the pursuit of happiness], the individual citizen, as a necessity, must be left free to adopt such calling, profession, or trade as may seem to him most conducive to that end. Without this right he can not be a freeman. This right to choose one's calling is an essential part of that liberty which it is the object of the government to protect, and a calling, when chosen, is a man's property and right. Liberty and property are not protected where these rights are arbitrarily assailed." This occurs in a dissenting opinion it is true; but there was no difference among the members of the court as to the fact that a man's business is his property, the difference being as to the application of certain amendments of the constitution of the United States.

It is generally held that if the injury is malicious, the person injured has a right of action. Indeed, it may be said that malicious injury to the business of another has long been held actionable. See Barr v. Trades Council, supra, 53 N. J. Eq. 115, 116, and citations. In the case of Mogul Steamship Co. v. McGregor, 23 Q. B. Div. 608 — a case which will be referred to more fully presently, Lord Justice Bowen said : "Now, intentionally to do that which is calculated in the ordinary course of events to damage, and which does in fact damage another in that other person's property or trade, is actionable if done

without just cause or excuse.    Such intentional action, when done without just cause or excuse, is what the law calls a malicious wrong." The decision in Barr *v.* Trades Council, supra, after citing this and other cases, proceeds: "When we speak in this connection of an act done with a malicious motive, it does not necessarily imply that the defendants were actuated in their proceedings by spite or malice against the complainant, Mr. Barr, in the sense that their motive was to injure him personally, but that they desired to injure him in his business in order to force him not to do what he had a perfect right to do.    .    . If the injury which has been sustained, or which is threatened, is not only the natural but the inevitable consequence of the defendants' acts, it is without effect for them to disclaim the intention to injure.    It is folly for a man who deliberately thrusts a firebrand into a rick of hay to declare, after it has been destroyed, that he did not intend to burn it.    .    . The law, as a rule, presumes that a person intends the natural result of his acts; and this is true with reference to civil as well as criminal acts."    Courts will look at the real substance of things, and do not stop at the mere form of words that may be employed.    See Moore *v.* Bennet, supra, 15 L. R. A. 361.

We will now refer to some authorities cited by defendants.    A leading case, in modern times, is the English case of Mogul Steamship Co. *v.* McGregor, supra.    It may not be amiss to give briefly its history.    It was first heard on an application for injunction before Lord Chief Justice Coleridge and Lord Justice Fry in 1885. They held that a confederation or conspiracy by an association of ship-owners, which was calculated to have and had the effect of driving the ships of other merchants or owners, and those of plaintiffs in particular, out of a certain line of trade, even though the immediate and avowed objects were not to injure the plaintiffs, but to secure to the conspirators themselves a monopoly of the carrying trade between certain foreign ports and England — was or might be an indictable offense, and therefore actionable, if private and particular damage could be shown.    But under the facts disclosed on that hearing, injunction ad interim was denied.    L. R. 15 Q. B. Div. 476.    The case was afterward heard by Lord Chief Justice Coleridge without a jury, and he rendered judgment for the defendants, holding that the evidence failed to show an actionable conspiracy, as alleged, and that it showed only sharp competition

in business, including holding out inducements by rebates, advantages, etc., to those who would deal with defendants exclusively. (1888) L. R. 21 Q. B. Div. 544. He stated, however, that he had long doubted and hesitated in reaching this conclusion. In the court of appeal, the case was heard before Lord Esher, Master of the Rolls, and Bowen and Fry, L. JJ. Lord Esher was of opinion that the appeal should be allowed, but was overruled by the other two Justices. (1889) L. R. 23 Q. B. Div. 598, 601. In the course of the opinion of Fry, L. J., which has been frequently cited in other cases, he says: "The ancient common law of this country, and the statutes with reference to the acts known as badgering, forestalling, regrating, and engrossing, indicated 'the mind of the legislature and of the judges that certain large operations in goods which interfered with the more ordinary course of trade were injurious to the public; they were held criminal accordingly. But early in the reign of George III, the mind of the legislature showed symptoms of change in this matter, and the penal statutes were repealed (12 Geo. III, ch. 71), and the common law was left to its unaided operations. This repealing statute contains in the preamble the statement that it had been found by experience that the restraint laid by several statutes upon dealing in corn, meal, flour, cattle, and sundry other sorts of victuals, by preventing a free trade in the commodities, had a tendency to discourage the growth and enhance the price of the same. This statement is very noteworthy. It contains a confession of failure in the past; the indication of a new policy for the future. This new policy has been more clearly declared and acted upon in the present reign; for the legislature has, by 7 & 8 Vict. ch. 24, altered the common law by utterly abolishing the several offenses of badgering, forestalling, and regrating." He also says a reference to the statutes of 1871 and 1875, enlarging the power of combination among workmen and masters, is indicative of public policy in England at the time of the decision. (We will presently compare this with the public policy of this State.) The majority of the court of appeal found, as matter of fact, that the defendants were not engaged in a conspiracy or unlawful combination, and were not actuated by malice or ill-will toward plaintiff, and did not aim at any general injury to plaintiff's trade, the object being simply to divert the trade from plaintiff to defendants, and that the damage to be inflicted was to be strictly

limited by the gain which defendants desired to win for themselves; in other words, that it was a case of competition only. Of course, the loss which a rival may suffer from legitimate competition does not give a right of action. The case was carried to the House of Lords, and the judgment of the majority was affirmed. (1892) 61 L. J. R. 295; L. R. App. Cas. (1892) 25. (Very full extracts from these decisions are made in 1 Eddy, Comb. § 249.) A careful consideration of the various decisions in this case will show that, in substance, it only held that where competition was lawful, even if sharp, and the acts complained of were adopted for the advancement of the defendants' own trade, there was no actionable conspiracy, although plaintiff may have sustained loss thereby. If this decision should be deemed adverse to the views here presented, it may be well to contrast the public policy of this State with that mentioned by Fry, L. J. Engrossing, forestalling, and regrating still stand in our code as criminal offenses, and the presiding judge is required to give the law in reference to these offenses specially in charge to the grand jury at each term of court. See Penal Code, §§ 662, 846. Our State constitution declares that the legislature "shall have no power to authorize any corporation . . to make any contract, or agreement whatever, with any such corporation [i. e., other corporations], which may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses, or to encourage monopoly; and all such contracts and agreements shall be illegal and void." Civil Code, § 5800. See *Central R. Co.* v. *Collins,* 40 *Ga.* 583 (6), 629; *Western Union Tel. Co.* v. *American Tel. Co.,* 65 *Ga.* 160; *City of Atlanta* v. *Stein,* 111 *Ga.* 789. What was said arguendo in *State* v. *Central Ry. Co.,* 109 *Ga.* 722, to the effect that all combinations are not necessarily illegal, has no application to the facts of the present case. As has been shown above, in the light of the evidence, it is futile for these defendants to claim that they were merely resisting an attack on the part of the plaintiff.

The following are some of the cases relied on by the defendants. Herriman *v.* Menzies (1896), 115 Cal. 16, 35 L. R. A. 318, arose on an action to enforce an accounting, under an agreement for the formation of an association for doing the business of stevedores. It was held not to be illegal, though one provision included the fixing of prices to be charged by the members. There was no effort

to force others to charge such prices; and it was said in the decision that there was nothing to show that the members comprised more than an insignificant part of the trade in numbers or volume of business, or any such restriction "as to preclude fair competition with others engaged in the business." Bowen *v.* Matheson, 14 Allen, 499, will be found to have been decided on the idea of competition, but it is not a well-considered case, reviews none of the authorities (but one being cited), and decides only as to certain allegations on demurrer. It has been criticised by Mr. Eddy, whose book shows that he approached the subject without any prejudice against combinations. 1 Eddy, Comb. § 571. Mr. Freeman in his note to Hardin *v.* American Glucose Co., 74 Am. St. R. 244, says: "Massachusetts seems also to have gone astray on the question of illegal combinations, . . having confused the doctrine relating to contracts in restraint of trade, and the doctrine against restrictions upon competition." Longshore Co. *v.* Howell (1894), 26 Or. 527, 28 L. R. A. 464, might be quoted as an authority for the plaintiff, except as to the necessity for injunction. The court says (28 L. R. A. 474): "While conspiracy in itself is not an indictable offense under our law, all these authorities show conclusively that such a combination for the purpose of doing injury to the public or to individuals is per se wrongful. Civil consequences are not changed by reason of the fact that the combination is not made a statutory offense." When the court came to consider the question of the necessity shown for an injunction (there having been a demurrer), it said (p. 475) that "although it might be inferred that a boycott was pending, they [certain notices] were not so positive nor so persistently and wickedly repeated and maintained as to authorize an injunction;" and again (p. 476), "there is no such persistent, aggressive, and virulent boycott now in progress," etc. It would seem to be rather too stringent to limit equity jurisdiction by so many adjectives. But in the present case the injury is in progress and is still threatened. McCauley *v.* Tierney (R. I. 1895), 33 L. R. A. 1, is another case relied on by defendants. If this decision is sound, it can only be on the idea that the defendants were seeking to obtain trade for themselves by saying, in effect: "If you deal with us, we will deal with you; if you deal with others, we will withdraw our patronage." Whether such an agreement was legally enforceable need not be discussed. There was no effort to compel or

coerce others not members to be bound by their prices or views. If the decision in Bohn Manfg. Co. v. Hollis, 44 Minn. 223, 55 N. W. 1119, 40 Am. St. R. 319, can be sustained, it must be on the same idea. No compulsory measures seem to have been used to enforce obedience on members; nor does there appear to have been any effort to drive away from plaintiff others than those voluntarily acting together in concert, and no pressure on outsiders to maintain prices or incur ruin. In truth, however, some of what was said in that decision is unsound, and not in accord with cases already cited. It has been considerably criticised. See Bailey v. Association (Tenn. 1899), 52 S. W. 857, supra; 1 Eddy, Comb. § 560 (p. 476), note; Jackson v. Stanfield (Ind. 1894), 23 L. R. A. 596, supra. Cote v. Murphy (Penn. 1894), 28 Atl. 191, and Buchanan v. Kerr, following it (p. 195), held that where employees had entered into a combination to control by artificial means the supply of labor, preparatory to a demand for an advance in wages, a combination of employers to resist such artificial advance is not unlawful, since it is not made to lower the price of labor as regulated by supply and demand. Certain Pennsylvania statutes were also considered as indicative of public policy on the line of combining to meet combination. The strong statement of Gibson, C. J., in regard to conspiracies (Com. v. Carlisle, Brightly, N. P. 40) is cited with approval.

In Payne v. W. & A. R. Co. (1884), 13 Lea, 507, there was no question of combination or conspiracy at all; and the Supreme Court of the same State rendered the decision in the later case of Bailey, already referred to. Parks v. Wholesale Association, Supreme Court of New York (1900), is cited. We must leave to the honorable courts of that State to reconcile that decision with the principle ruled in Parker v. National Druggists Association, 50 N. Y. Supp. 1064, where (as quoted in 1 Eddy, Comb. § 330, p. 213) it was held: "It is in restraint of trade and unlawful for a manufacturer to become a party to a combination which shall prevent any of his customers from obtaining other goods of other manufacturers because those customers violate the agreement with him in respect to the cutting of prices;" and also with People v. Sheldon (N. Y.), supra. It seems, too, that in some cases in New York and elsewhere an idea has arisen of determining how much competition is desirable, and apparently of holding that extreme competition is undesirable,

and a combination to meet it is not unlawful.   The fallacy of such a standard is clearly shown by Judge Taft in United States *v.* Addystone Co., supra, and Mr. Freeman in his note to Harding *v.* American Glucose Co., supra.   Brewster *v.* Miller. (Ky. 1897), 38 L. R. A. 505, held that an association of undertakers might lawfully agree to decline to render service in their business to one who had refused to pay a bill to some member of the association for similar services previously rendered.   Here, also, there was no effort to compel persons not members to uphold the prices or obey the dictates of the association, or to coerce members or others; but only a voluntary, united refusal to serve a person who would not pay for similar services.   Continental Ins. Co. *v.* Board of Underwriters, 67 Fed. R. 310, sought to follow the decision in the Mogul Steamship case, and held that the acts there complained of were for the purpose of competition, and not maliciously done.   Here again there was no effort to drive out of business companies not members, further than non-intercourse and not having the same agents.   So far as the enforcing of these provisions by a penalty is concerned, the decision is in conflict with Boutwell *v.* Marr, supra.

Finally, was the plaintiff entitled to an injunction ?   The usual grounds for the grant of an injunction in such cases are, (1) an injury which threatens irreparable damage, or (2) a continuing injury when the legal remedy therefor may involve a multiplicity of suits. " The difficulty of satisfactorily estimating damages to business is frequently recognized in applying those principles to suits relating to good will, trade-marks, patent-rights and copyrights.   3 Pom. Eq. Jur. §§ 1352, 1354." Barr *v.* Trades Council, 53 N. J. Eq. 126 et seq., and authorities cited.   Mr. Eddy says: " An injury is irreparable when the damage can not be measured by any known pecuniary standard.   The destruction of, or even injury to, a growing business can not very well be measured in damages, since it is difficult, if not impossible, to lay down any rule whereby a jury can definitely ascertain the damages inflicted; the owner of the business himself probably could not estimate his loss, and yet the loss would be beyond dispute." (Citing authorities.)   2 Eddy, Comb. §§ 1014, 1024, 1026, pp. 1161, 1169, 1170; Blindell *v.* Hogan, 54 Fed. R. 40 (affirmed on appeal, 56 Fed. R. 730).   Several of the cases already cited arose upon applications for injunction, and apply to this feature of the case.   It is urged that the plaintiff was

not entitled to equitable relief, because it did not come into a court of equity "with clean hands." The specific claim of uncleanness is that, on some occasions, it sold one drug or mixture instead of, or purporting to be, another. This is denied. If it were true, it would be no defense to this case. If it is undertaken to coerce a dealer not to sell at reduced prices, and is sought unlawfully to destroy its business if it does so, an application by it for injunction is not successfully met by saying that it sold some spurious goods, or misrepresented some to customers in certain sales. It was money, not morals, that moved the defendants in their conduct toward it for cutting prices. The doctrine that a suitor must enter a court of equity "with clean hands" has reference to the transaction complained of by him. *Ansley* v. *Wilson*, 50 *Ga*. 425. If plaintiff sells adulterated drugs, it and its officers are liable to punishment under the criminal law. Penal Code, §§ 483, 484.

The learned judge did not err in holding that the defendants who are members of the Atlanta Druggists Association, in the name of such association or otherwise, should be enjoined from sending out to wholesale druggists or proprietors of proprietary medicines through the mails, or delivering them to them otherwise, the letter and agreement set out in Exhibits A and B to plaintiff's petition, or seeking to cause the latter to be signed by means of the letter set out in Exhibit A, or other like means, or sending out any letter, circular, or agreement of similar character or purpose, directly or indirectly, to wholesalers, jobbers, or proprietors; and from issuing to salesmen and causing to be signed the card agreement attached to the petition as Exhibit C, or any card or agreement of similar import or purpose; and from in any manner threatening or seeking to intimidate wholesalers or proprietors, and so prevent them from selling to plaintiff as a cutter or aggressive cutter; and from conspiring and from seeking to prevent wholesale or other druggists from dealing with or selling to plaintiff, by direct or indirect threats of cutting off their means of obtaining goods or merchandise, or of causing such means to be cut off, or of causing them injury or loss of custom if they should deal with or supply the plaintiff; and from taking part in or carrying out any conspiracy or combination for that purpose ; and from designating or pointing out the plaintiff to other druggists' associations or their representatives as an aggressive cutter, and from writing or sending

through the mails any card, circular, letter, or other written or printed communication conveying, or intended to convey, to proprietors or wholesalers throughout the United States that plaintiff is an aggressive cutter and under the ban of the local organization, or of similar import.

2. The learned trial judge based his judgment, in part, upon the act of the General Assembly approved December 23, 1896 (Acts 1896, p. 68), commonly known as the " anti-trust act." The defendants in the court below attacked the constitutionality of this act, and one of the exceptions to the judgment is that the court erred in holding it to be constitutional. Since this case was heard and determined in the lower court and argued here, the Supreme Court of the United States, in a decision rendered March 10, 1902, in the case of Connolly v. Union Sewer Pipe Co., held the anti-trust statute of Illinois, which contained a provision that it should " not apply to agricultural products or live stock in the hands of the producer or raiser," to be repugnant to the provisions of the fourteenth amendment of the constitution of the United States, because it denied the equal protection of the laws of that State to those within its jurisdiction who were not producers of agricultural products or raisers of live stock. The " anti-trust act" of this State, above referred to, exempts from its operation " agricultural products or live stock while in the possession of the producer or raiser." Consequently, under the decision of the Supreme Court of the United States, we are constrained to hold that this exemption renders the act unconstitutional. As will have been seen, however, the judgment of the court was right, irrespective of the provisions of this act.

3. Certain assignments of error in the bill of exceptions complain, in effect, that the injunction was too broad, because it was operative upon the individual members of the association to which the defendants belonged, and therefore had the effect of cutting them off from the exercise of individual rights which it was their privilege to exercise, provided there was no unlawful conspiracy. The reply to this is, that the judge found there was a conspiracy. He could not enjoin the combination in the abstract, but, to render any effective protection to the plaintiff, was obliged to enjoin the individual members of the association from doing the unlawful acts which they had conspired to do and were actually doing when the

petition was filed.    It was the only possible way in which to make
the writ of injunction of any avail.    The defendants could not,
fresh from the conspiracy and inspired by the purposes thereof,
fail to injure the plaintiff, if allowed to continue their unlawful acts
under the guise of doing so upon their individual responsibility.

   *Judgment affirmed, with direction.    All the Justices concurring,*
*except Lewis, J., absent.*