## THE TEXAS STANDARD OIL COMPANY ET AL. V. B. ADOUE ET AL., DIRECTORS.

### No. 3407.

1. **Contract in Restraint of Trade—Illegal.**—To render a contract void it is not necessary that it should create a pure monopoly. It will be illegal if the natural or necessary consequences of its operation are to prevent competition and create fictitious prices independent of the law of supply and demand; and to such an extent as to injuriously affect the interests of the public, or the interests of any particular class of citizens who may be interested, either as producers or consumers, in the articles which are the subject of restrictions imposed by the contract. See example.

2. **Howard Oil Company Combination Illegal.**—The Howard Oil Company made a contract with owners of four other cotton seed oil mills operated at different points in the State, whereby prices of seed cotton and cotton seed were fixed, and the markets where each was to buy named, and the prices of the oil, meal, cake, and lint were adjusted, the prices to be changed only by means stipulated. The markets named as affected by the contract are the principal cotton markets in the State. The *four mills* were guaranteed certain profits upon all cotton and cotton seed handled by them. Suit upon the guaranty against the Howard Oil Company and their directors. *Held*, that the contract declared on was illegal and void.

APPEAL from Galveston. Tried below before Hon. WM. H. STEWART.

This suit was instituted by the appellants against the appellees, as defendants below, to recover the guaranteed net prices offered to the owners of "the four mills" (represented by appellees) for all of the products of said mills, as well as for the costs and expenses of production, in consideration of a strict performance upon their part of all of the "covenants" in the contract hereinafter described, and which is made the basis of this action. At the time of entering into said agreement the parties thereto were independent dealers in and purchasers of cotton seed and seed cotton, and engaged separately in the business of manufacturing therefrom "oil, oil cake, and other products of cotton and cotton seed," in various cities in the State of Texas. The Howard Oil Company was authorized by its charter to establish and operate its mills or manufactories "at Dallas, Texas, and at such other places in the State as its business may require and demand." By virtue of an amendment to its charter this corporation expired by limitation upon the 1st day of July, 1889, and its directors were made parties defendant. The contract sued upon also terminated upon that date. The provisions of this contract, so far as need be stated, are as follows:

"Agreement entered into this 11th day of September, 1888, by and between the Howard Oil Company, a corporation organized and existing under the laws of the State of Texas, and Samson Heidenheimer, of Galveston, Texas, on behalf of himself and all the other owners and controllers of four certain cotton seed oil mills situated at Galveston, Brenham, Schulenburg, and Weimar, all in the State of Texas, and two

of which are operated under the name of the Texas Standard Oil Company.

"The prices which shall be paid by the parties hereto and their representatives per ton for sound cotton seed, in the State of Texas, during the period of this agreement, shall, until changed in the manner hereinafter provided, be as follows:

"At Galveston, Texas, $9 per ton and wharfage, delivered on the wharf.

"At all other stations in Texas, excepting where the mills of the parties hereto are situate, $7 per ton to agents or shippers, delivered free on board cars.

"At all stations in Texas where mills of either party hereto are situated, namely, Brenham, Schulenburg, Weimar, Dallas, Navasota, Palestine, La Grange, Sherman, Houston, and San Antonio, $6.50 per ton, delivered by wagons.

"The price which shall be paid by the parties hereto and their representatives for sound cotton seed, as aforesaid, may be increased or diminished at any or all the above classes of stations by mutual agreement, in writing, of the parties hereto.

"The said Samson Heidenheimer agrees, for himself and his associates and agents, to pay, during the term of this agreement, only such prices for sound cotton seed as are herein fixed and as may hereinafter be agreed upon as aforesaid.

"The said four mills represented by the said Heidenheimer shall not, either directly or indirectly, purchase, handle, or ship any seed from the following stations, namely: Houston, Waco, Dallas, Palestine, Corsicana, Paris, Austin, Columbus, and Belton, all in the State of Texas.

"If any seed be shipped from Schulenburg, Weimar, or La Grange, the Howard Oil Company shall have the right to purchase two-thirds thereof and the four mills represented by the said Heidenheimer shall have the right to purchase one-third thereof, and no more. The said Howard Oil Company shall not purchase any seed at nor ship any from Brenham during the term of this agreement.

"The said four mills represented by the said Heidenheimer shall purchase prime and sound seed only; but should inferior or damaged seed be shipped to any of them, such seed shall be rejected as sound seed, and paid for only at its actual value as compared with prime sound seed.

"The prices which shall be paid by the parties hereto and their representatives for seed cotton during the period of this agreement shall, until changed in the manner hereinafter provided, be 2¾ cents per pound and wharfage, delivered on the wharf at Galveston. A fair and equitable division of the amount of seed cotton which may be purchased by either party shall be made, and may be adjusted from time to time, by mutual

agreement, between the said Howard Oil Company and the Galveston mill of the Texas Standard Cotton Oil Company.

"The prices which shall be paid by the parties hereto and their representatives for seed cotton, as aforesaid, may be increased or diminished by mutual agreement between John L. Kane, representing the said Howard Oil Company, and Samson Heidenheimer, representing the said Galveston mill of the Texas Standard Cotton Oil Company.

"All seed derived from seed cotton purchased as aforesaid by the said Galveston mill shall be accounted for at the same price as cotton seed delivered on the wharf at Galveston.

"Due care and diligence shall be exercised by the said Heidenheimer and the said four mills to properly protect and prevent the heating of all seed purchased, handled, and stored by the same. In consideration of the covenants herein by the said Heidenheimer and the said four mills to be performed, the said Howard Oil Company guarantees to the said Heidenheimer, as representative of said four mills, a profit of three dollars for every ton of sound seed properly worked by him in the said mills, allowing four dollars per ton for the expenses of working the said seed, in addition to the price paid by him for the same, as above agreed, and freight on board at the respective mills.

"The entire make or yield of cotton seed of the aforesaid four mills shall be delivered by the said Heidenheimer to the said Howard Oil Company, or to its order, in tank cars furnished by the latter at the respective mills; and in case the said Howard Oil Company should be unable at any time to supply a sufficient number of tank cars at Galveston, as and when the same shall be required under the terms hereof, then the said mill at Galveston shall hold such oil in suitable storage, to the extent of five hundred barrels, without charge therefor; and should the said mill be required to provide storage for more than that amount of oil, then the said Howard Oil Company shall pay for such surplus on delivery of the warehouse receipts therefor; but the said mill shall not be required to provide storage for more than eighteen hundred barrels of oil.

"All oil made by the said four mills shall be of the quality known as prime crude oil, and shall be fully equal to prime crude oil made by the Howard Oil Company or the Galveston Oil Company.

"The said Howard Oil Company shall pay for the said oil such a price as will insure to the producer thereof a profit of three dollars per ton for each ton of the seed from which the said oil has been properly made, as aforesaid.

"Such profits shall be estimated by deducting from the cost of the seed the freight and the working, the total gross price received for all the products of the seed.

"Payments shall be made from time to time on the aforesaid basis as the oil is forwarded. Such payments may be made by sight draft

with bill of lading attached, and the estimated price to be paid each producer is as follows: The Galveston mill, 26 cents; the Brenham mill, 21 cents; the Schulenburg mill, 21 cents; the Weimar mill, 21 cents, per gallon. The account between the parties hereto shall be adjusted every thirty or sixty days, and a final adjustment shall be made at the termination of this agreement.

"Any oil produced at any of the aforesaid mills, which may not equal the specified standard, shall not be included in the foregoing arrangement, but shall be paid for only at its market value. If any difference, dispute, or question shall arise between the parties hereto as to the quality of the said oil, such difference, dispute, or question shall be submitted to John L. Kane, of Galveston, Texas, whose decision shall be final and binding upon the parties hereto.

"The said Howard Oil Company shall fix, and may from time to time alter, the minimum price at which all meal, cake, and lint produced at the said four mills shall be sold; and the said mills shall not sell any meal, cake, or lint at a price less than that so fixed and so altered. All such meal, cake, or lint shall be offered to the said Howard Oil Company before the same is offered for sale to any other parties; and the said Howard Oil Company shall have the right and option to purchase all or any of the said meal, cake, and lint at such minimum price of the market price of the day at the place of production as the said company may elect; provided, that no sale shall be made to any person at any price below the minimum hereinbefore provided for.

"The said Howard Oil Company shall declare its option for each lot of meal, cake, and lint, on receiving a written tender from the said Heidenheimer, which tender shall state the amount of each product offered, the date when deliverable, and that to the best of his knowledge and belief a necessity will exist for the removing of said product from the mill named on the date named, owing to a lack of proper storage capacity. Should the said Howard Oil Company decline at any time to exercise any such option so offered, if the minimum price of any of the said products be at that time fixed by it above the market price thereof, it shall reduce the said minimum price of the products in question' for the time being to such market price to enable the said Heidenheimer or his agents to dispose of the same to other parties, to which end the said Heidenheimer promises to use due diligence and skill. Whenever the said Howard Oil Company shall exercise such option, the said Heidenheimer shall place at the free disposal of the said company all the tonnage secured, controlled, or arranged for him or his agents; and he shall assist the said company in all reasonable ways to secure the desired tonnage at fair rates; and whenever the said company declines to exercise such option, it shall assist the said Heidenheimer in the same manner.

"The said four mills shall have the privilege of supplying their present local trade with meal and hulls; and the price at which such meal and hulls shall be sold shall be fixed, and may be increased or diminished by mutual agreement between John L. Kane, representing the said Howard Oil Company, and Samson Heidenheimer, representing the said four mills.

"All hulls and ashes sold by the said four mills, or either of them, shall be accounted for at each adjustment at the price realized therefor; and the amount thereof shall be added as a profit on products to the said mills in estimating the cost of the oil.

"The said four mills shall respectively keep accurate accounts of all cotton seed purchased by them or on their account, and of all the oil, meal, cake, and lint produced by them respectively, during the term of their agreement; and the said Howard Oil Company shall have the right, from time to time, and at all reasonable times, through its agents, to inspect the books and accounts of the said four mills, relating to the subject matter of this agreement.

"This agreement is to be considered as in force and effect from the first day of July, 1888, and to endure until the first day of July, 1889.

> "TEXAS STANDARD COTTON OIL CO.,
> "HILGE BROS.,
> "C. BAUMGARTEN,
> "HOWARD OIL CO."

The defendants demurred to the plaintiffs' petition upon the ground that the above contract (which is made a part of the petition) is in restraint of trade, unreasonable, contrary to public policy, and void, because intended to reduce the price of "cotton seed and cotton in the seed" in the State of Texas and to stifle competition, to the detriment of the public, etc. The court sustained the demurrer and dismissed the petition, and the plaintiffs thereupon appealed from this judgment.

[This statement accompanied the opinion.]

*Finlay & Finlay* and *Scott, Levi & Smith*, for appellants.—1. Contracts which impose an unreasonable restraint upon the exercise of a business, trade, or profession are void; but contracts in reasonable restraint thereof are valid.   Angier v. Webber, 92 Am. Dec., 751; Bish. on Con., secs. 515, 516; Story on Con., 550; 2 Pome. Eq. Jur., sec. 934; Metc. on Con., 2 ed., 232, 269; Nav. Co. v. Wright, 6 Cal., 259; Wright v. Ryder, 36 Cal., 342; Duffy v. Shockey, 11 Ind., 70; Beard v. Dennis, 6 Ind., 200.

2. The rules applicable to contracts in restraint of trade are: first, to be valid, the restraint must be partial only; second, it must be founded upon a valuable consideration; and third, it must be reasonable and not oppressive.   1 Ct. App. C. C., secs. 723–726; Pierce v. Fuller, 8 Mass., 223; Pike v. Thomas, 7 Am. Dec., 741, and note; Alger v. Thacher,

31 Am. Dec., 119, and note; Craft v. McConoughy, 79 Ill., 346; Newell v. Mayendorf, 9 Mont., 254; Moore Hardware Co. v. Towers Hardware Co., 97 Ala., 206; Shade Roller Co. v. Cushman, 143 Mass.; 253; Kellogg v. Larkin, 56 Am. Dec., 164; Long v. Towe, 42 Mo., 545.

3. There is no provision in the contract which would legitimately authorize the conclusion that the same was intended to stifle competition and purchase cotton or cotton seed at less than their fair value. Manufacturers and mill owners can not be required to purchase raw material in any other mode or on any other terms than may be advantageous to their own interests. They may unite in any such number as may be necessary to make the purchases advantageous to themselves, provided this junction of interests be without any "dishonest motives" or injurious consequences. There is nothing in the petition or contract to indicate that the prices agreed to be paid for cotton or cotton seed were not their fair market value. The contract in itself does not imply a dishonest motive, an improper end, an injurious consequence, or that its execution would stifle competition, or in any manner be in restraint of trade. James v. Fulcrod, 5 Texas, 512.

4. There is nothing in the petition or contract to indicate how many oil mills there are in Texas, or in what form or particular the said contract could be construed as "stifling competition;" nothing to show what was the price of cotton seed and cotton in the seed, or whether the prices named in the agreement were the market prices or not; nothing to show what the cost of manufactured cotton seed amounted to for work and labor done in same; nothing to show that the amount allowed for expenses of manufacturing cotton and cotton seed, and the profits on the same, as stipulated in the contract, were not a fair and reasonable compensation for the same.

5. Before the court should determine a contract to be void, as contravening policy of state, where the contract is made in good faith, and stipulates for nothing that is malum in se or malum prohibitum, it should be satisfied that the advantage to accrue to the public for so holding is certain and substantial, not theoretical or problematical. Kellogg v. Larkin, 56 Am. Dec., 164.

6. The contract sued on is not contrary to public policy, nor in restraint of legitimate trade, because it shows a lawful combination of individuals to pursue a legitimate business for substantial common account; and the provision regarding price to be paid for cotton seed at different points has reference to settlement of accounts between the parties concerned, agreeably to the provision of the contract in that regard. And no party was prohibited from paying prices for seed higher than those named in the contract, and each party was at liberty to pay such higher price, with the legitimate proviso that at whatever price seed might be bought, they would be carried into the accounts of the parties at the price stipulated in the contract on final settlement.

*McLemore & Campbell,* for appellees.—The contract being in restraint of trade and unreasonable, is void. Is it unreasonable, and as such against public policy? The restraint is general as to the State of Texas, and regulates the parties as to what places or localities the parties can buy at any price—covering by the terms of the agreement the State of Texas, from Galveston in the south to Paris and Palestine in the east, the entire line of the Central Railway from north to south, and from Houston to San Antonio in the west, and Austin and Brenham as located—embracing the cotton producing territory of the State of Texas as penetrated by the railways of the country. The regulations themselves are as embracing in their provisions as the rules that govern any one enterprise under a common government. And they operate to keep down competition amongst the parties throughout the State for the common product of this cotton producing country, and exclude dealing by purchase or otherwise in all territory of the several mills, so as to give as between themselves a monopoly in favor of the particular mills. The regulations include the "Book of Trade" from Genesis to Revelation, and are in no sense partial or intended for their own protection as separate dealers. Wiley v. Baumgardner, 97 Ind., 66; Mallan v. May, 11 M. and W., 653; Homer v. Graves, 7 Bing., 753; Arnot v. Coal Co., 63 N. Y., 558; Leonard v. Poole, 114 N. Y., 371; Coal Co. v. Coal Co., 68 Pa. St., 173; Hooker v. Vandewater, 4 Denio (N. Y.), 352; Bank v. King, 44 N. Y., 87; Craft v. McConoughy, 79 Ill., 346; Railway v. Railway, 15 Fed. Rep., 650; Salt Co. v. Gutherie, 35 Ohio St., 666; Hunter v. Pfeiffer, 108 Ind., 197; Angier v. Webber, with the notes, 92 Am. Dec., 748–763; Bish. on Con., secs. 515, 516; Pars. on Con., sec. 748; Whart. on Con., secs. 430, 431; 11 Chitty on Con., p. 982, et seq., and authorities in notes.

The result of the cases and text writers is, that the restraint imposed to be lawful must be partial and intended to operate only for the mutual protection of the parties to the contract, and not such as to prevent competition and encourage the engrossment of the market or to exclude rivalry and monopolize business. And where the agreement imposes a restraint larger than this, it is unreasonable and void, as being injurious to the interest of the public, on the ground of public policy. The evil being the same as disclosed in "trusts" of modern society, and which since the laws of 1889 in Texas have been denounced as felonies and punished as such. Sayles' Civ. Stats., art. 4847a.

MARR, JUDGE, *Section A.*—The appellants assign as error the action of the court in sustaining the demurrer to their petition upon the ground that the contract sued upon is contrary to public policy and void. The appellants' counsel do not deny that the contract is one in restraint of trade, but contend that it is but partially so, and is limited in its operation to a reasonable protection of the interest of the parties

thereto, and therefore *not* void.   We may state in the outset that we do not understand that the provisions of the contract left any of the parties thereto at liberty to purchase cotton seed at any price which they might obtain (as contended by appellants), and to simply render an account of the purchases at the prices fixed by the contract.   The prices to be paid for the "cotton seed" were arbitrarily established by the terms of the contract without reference to the market, and were to be changed only by "mutual agreement" of John L. Kane and Samson Heidenheimer.   Those established for the purchase of "cotton seed" could not be "increased or diminished except by the mutual agreement in writing of the parties" to the contract.   The Howard Oil Company alone was invested with the absolute power of fixing and "from time to time" of altering "the *minimum* price at which all meal, cake, and lint produced at said four mills shall be sold;" and said mills were expressly prohibited from selling such products at less than the minimum price so established; and the Howard Oil Company was given an optional preference to purchase "all of such meal, cake, and lint."   None of these "four mills" belonged to said company, but to the other parties to the agreement.  If the object of the contract had been merely to provide in good faith a uniformity of prices among the parties thereto, to avoid unhealthy fluctuations in the market, or if the contract had contemplated a joint and mutual association between the parties for their common benefit in the nature of a partnership and had simply fixed the prices at what they considered the business would bear, instead of a combination between independent manufacturers and dealers for the purpose of at least destroying all competition between themselves, then there might have been nothing in such an arrangement which the courts could denounce as pernicious and forbidden by law.  There is no pretense, however, that any partnership was contemplated in this instance; and if there had been, the entire absence of any community of interest in the profits, losses, or capital employed, would have effectually repelled the assumption.

Each party retained, after the contract as before that time, the control of his capital and the operation of his own mills, and did not throw his capital or manufacturing concerns into a common stock.   He continued to operate with his own separate means, but surrendered his right of competition and of supplying his mills with raw material at the best prices he might otherwise have obtained in the markets of the State, and consented to submit to rates artificially established.   But the contract—rather, I should say, the combination—did not stop at establishing prices merely.   It extends far beyond this, and imperatively prohibits one of the parties in particular from "purchasing, handling, or shipping, directly or indirectly, any cotton seed" at many of the most important markets in the State, and binds it to deliver the entire products, "make or yield" from cotton seed, of its mills to the

other party to the contract, in consideration of certain net profits guaranteed to it. We do not say that there would have been anything wrong in this last stipulation had it stood alone as an entire contract of purchase and sale of the products of the mills represented by Heidenheimer. But it does not stand alone and evidence merely an intention upon the part of the owners of "the four mills" to obtain in good faith the best prices for their own oils, without aiding or assisting the other party in any unlawful scheme or conspiracy. It forms a part of the general plan, and was plainly, as the contract expresses, superinduced by the other provisions, or "covenants," of the agreement, inserted mainly for the benefit of the Howard Oil Company, and is, therefore, inextricably interwoven in these "covenants." The latter company was allowed to purchase cotton seed at any "station in Texas," except Brenham; but the "four mills," represented by the other parties to the contract, were entirely excluded from the cities of Houston, Waco, Dallas, Palestine, Corsicana, Paris, Austin, Columbus, and Belton—"all in the State of Texas." In reference to shipment of seed from Schulenburg, Weimar, or La Grange, the Howard Company could purchase two-thirds, and the four mills "one-third thereof, and no more."

It thus appears that the above artificial regulations of the value or prices of these staple articles of trade, as well as the arbitrary restrictions imposed by the contract upon the right to deal in them in the usual or customary course of legitimate business, were intended to apply to and control, as far as the contracting parties were able to do so, the market in reference to these staples, and the agreement embraces within its operation the chief cities or commercial centers of the State, as well as the cotton producing regions thereof, as we may judicially know. Railway v. State, 72 Texas, 409; 1 Whart. Ev., secs. 329, 339.

There seems to us to be scarcely anything lacking to characterize the combination between the parties in this case, as evidenced by the language and purpose of their agreement, as a complete monopoly except the proof that they were the only parties who were engaged at the specified localities in the manufactures referred to in the contract, at the time it was made. It is not improbable that every cotton oil mill in the State was represented in this combination, or was intended to be brought into it eventually; but as this is not alleged in the petition, we can not presume it. We must admit some limit even to *judicial knowledge*.

But to render the contract void it is not necessary that it should create a pure monopoly. It would seem that the agreement may be illegal if the natural or necessary consequences of its operation are to prevent competition and create fictitious prices independent of the law of demand and supply, and to such an extent as to injuriously affect the interest of the public, or the interests of any particular class of

citizens who may be especially interested, either as producers or consumers, in the articles or staples which are the subject of the restrictions imposed by the contract. Likewise, the agreement may be, in some instances, void because of unreasonable or oppressive restrictions imposed upon even one of the parties to it. According to the authorities, the extent of the restraint, though sometimes difficult to measure, determines the character of the agreement, whether legal or not. Pike v. Thomas, 7 Am. Dec., 741, and note. The authorities are too numerous to even cite all of them. From the multitude we shall make a few selections later on; and now we proceed with the examination of the contract.

It will be seen that the Howard Company was given almost an unrestricted field to obtain the raw material for its mills, and the exclusive right to control, free from the competition of the owners of the "four mills" (who had no doubt up to that time been its rivals) not only the sales and ruling prices of the products of its own mills (which are not disturbed in this respect), but also "the entire yield" of the mills of the other parties to the contract. It was thus enabled by the confederation of all of the parties to dictate at will the prices at which the public must buy (if at all) the oils or other products of any of the mills. If both of the parties had entered a market open to both under the contract, in order to purchase the raw materials they could not have competed, for no competition was contemplated, and all freedom of action in this particular was forestalled by arbitrary regulations of the prices to be paid, which must be observed. In the markets assigned to each, they are confronted by the same barrier, and the party can not buy at all if the market price at that point happens to be greater than the contract price; or if the price prevailing there should *even* be *below* the contract price, still the party could not avail himself of this advantage without first obtaining, if he *could,* the consent of the other parties. In other words, neither the parties nor the producers of the raw material are to have the benefit of but *one* price, which has been definitely fixed in advance. These things, as it seems to us, are well calculated to affect the interests of the public detrimentally, and would doubtless have been deemed by the parties as injurious to their own interests had they been contemplating a lawful enterprise. These restrictions, however, were instituted in this instance not for the purpose of legitimate profits nor to afford only a fair protection to all of the parties, but as suitable means for preventing all competition. If not, then it would have clearly been to the advantage of the Howard Oil Company, in view of its obligations to the "four mills," that the raw materials should be bought by all of the parties to the contract at the lowest figures. This company had bound itself to pay or bear the cost of the seed as well as the expenses of "working" the same by "the four mills," etc.

We recur now to the law of the case. We can scarcely conceive how mere territorial limits can be the controlling test in all instances of the legality of the restraints imposed upon the ordinary course of trade. This criterion may do very well when applied to the occupation or profession of one man or even a few individuals; for neither their labor, industry, business, nor services may be so necessary to the public as not to be dispensed with without inconvenience or injury. It appears to us, however, that the case is very different in regard to trade or commerce in those articles of prime necessity or even of very frequent use among a large number of people in any given locality. Does any one doubt that a combination of a number of the most extensive dealers in flour, meat, or oils, etc., in one great city, to sell those commodities at only one price or not at all *within the limits* of that city, would affect the interests of the public, and, perhaps, also some of the individual dealers, much more extensively and disastrously than a similar agreement extended to a much greater area of country but in which only a very few people reside or require such articles? It would seem that the injurious effects upon the public interests would be in proportion to the number of people affected by the restrictions, though we are not unaware that this position has not been deemed tenable by some of the authorities in cases where the right to exercise a trade or profession within a particular district or locality has been restricted by contract. Mallon v. May, 11 M. & W., 653; but see 11 Ind., 70; 1 Smith Lead. Cases, 183; 92 Am. Dec., 751. We think that territory can not be the sole test, though in the present instance the contract embraces such extensive territory and such a number of localities as to bring it even within that rule. In determining the reasonableness of the restraint the effect upon the interest of the public is a better test.

In the case of the Morris Coal Company v. Barclay Coal Company, 68 Pennsylvania State, 185, the Supreme Court of Pennsylvania quote with approval the following language of Tindal, Chief Justice, in Horner v. Graves, 7 Bingham, 743: ''We do not see how a better test case could be applied to the question whether reasonable or not than by considering whether the restraint is such only as to afford a fair protection as to the interest of the party in favor of whom it is given and not *so large* as to interfere with the *interests* of the *public.* Whatsoever restraint is larger than the *necessary* protection of the party can be of no benefit to either; it can only be oppressive; and if oppressive, it is in the eyes of the law unreasonable. What is injurious to the public interest is void on the ground of public policy.''

The court also recognizes the doctrine that the ''public interest is superior to private interest,'' and that even as to ''contracts for the *limited* restraint of trade, the courts start with the presumption that they are illegal unless *shown* to have been upon adequate consideration

and upon circumstances both *reasonable* and *useful.''*    The court further-more said, that ''testing the present contracts by these principles, the restrictions laid upon the production and price of coal can not be sanctioned as reasonable, in view of their intimate relation to the public interests.    The field of operation is too wide and the influence too general.    The effects produced on the public interests lead to the consideration of another feature of great weight in determining the ille-gality of the contract, to-wit, the *combination* resorted to by the five companies.    Singly, each might have suspended deliveries and sales of coal to suit its own interests, and might have raised the price, even though that might have been detrimental to the public interest.    There is certain freedom which must be allowed to every one in the manage-ment of his own affairs.    When competition is left free, individual error or folly will generally find a correction in the conduct of others.''    We approve of these observations, but *do not* sanction a *combination* of in-dividuals to stifle competition.    The court then proceeds, in the next place, to discuss at length the extent and scope of the combination, and denounces it as a conspiracy intended to control the coal markets of the country by stifling competition, and therefore void.

''Whatsoever a man may lawfully forbear, that he may oblige him-self against, except where a third person is wronged or the *public* is prejudiced by it.''    Metc. on Con., 232.    This language was adopted by the Supreme Court of Ohio in Crawford v. Wicks, 18 Ohio State, 203, which involved the construction of a contract in restraint of trade. We refer to this decision as bearing upon those provisions in the con-tract in hand which prohibits the parties from purchasing cotton seed in the specified localities, etc.

In the case of Arnot v. Elmira Coal Company, 68 New York, 566, the court uses the following language: ''If an absolute purchase had been made by the defendant of the Butler Coal Company of any specified quantity of coal, or even of *all* the coal which the Butler Company could produce, that contract would have been legal, notwithstanding that the object of the purchaser was to secure a monopoly and that the vendor knew it.    He had a right to dispose of his goods; and under certain limitations a vendor may recover for their price, notwithstand-ing that he knows that the vendee intends an improper use of them, so long as he does nothing to aid in such improper use, or in the illegal *plan* of the purchaser.    But—and this is a very important distinction— if the vendor does anything beyond making the sale to aid the illegal scheme of the vendee, he renders himself particeps criminis, and can not recover for the price,'' etc.    Elsewhere in the opinion it is said: ''Every producer or vendor of coal or other commodity has the right to use all legitimate efforts to obtain the best price for the articles in which he deals.    But when he endeavors to artificially enhance prices by sup-pressing or keeping out of the market the products of others, and to

accomplish that purpose by means of contracts binding them to withhold their supply, such arrangements are even more pernicious than *combinations not* to sell *under* an *agreed price*. Combinations of that character have been held to be against public policy and illegal. If they should be sustained, the prices of articles of pure necessity, such as coal, flour, or other indispensable commodities, might be artificially raised to a ruinous extent, far exceeding any naturally resulting from the proportion between supply and demand."

We have already shown that the agreement under consideration does not evidence simply a contract made in good faith for the sale by the owners of the "four mills" to the Howard Oil Company of the products of their mills. In the case of the India Bagging Company v. Kock, 14 Louisiana Annual, 168, it was held that an agreement between eight commercial firms in the city of New Orleans, whereby they bound themselves for the period of three months not to sell India bagging except with the consent of a majority of them, was void. The decision seems to have been based, from the authorities cited, upon the principles of both the civil and common law. The court said: "The agreement between the parties was palpably and unequivocally a combination in restraint of trade, and to enhance the price in the market of an article of primary necessity to *cotton planters*. Such combinations are contrary to public order and can not be enforced in a court of justice."

Nowhere, perhaps, is the duty of the courts in reference to contracts of the character we are considering, as well as the present state of the common law (in the absence of statute), even under "the modern doctrine," better defined than in the opinion of the Supreme Court of Michigan in Raymond v. Leavett (cited by Wharton, infra, p. 612), from which we cull the following: "We do not feel called upon to regard so much of the common law to be obsolete as treats these combinations as unlawful, whether they should now be held punishable as *crimes* or not. * * * There may be difficulties in determining conduct as in violation of public policy where it has not before been covered by statutes as precedents. But in the case before us the conduct of the parties comes within the undisputed censure of the law of the land, and we can not sustain the transaction without doing so on the ground that such dealings are so manifestly sanctioned by usage and public approval that it would be absurd to suppose that the Legislature, if attention were called to them, would not legalize them. We do not think public opinion has become so thoroughly demoralized, and until the law is changed we shall decline enforcing such contracts. If parties see fit to invest money in such ventures, they must get it back by other than legal measures."

The attention of our own Legislature seems to have been "called" to the subject; but instead of "legalizing" such combinations or con-

spiracies in restraint of trade, the Legislature has denounced them as felonies, thus manifesting the public sentiment in this State. This was done, however, subsequently to the execution of the contract in hand. Space forbids us to make any more extracts from the opinions to be found in the adjudicated cases. We are of the opinion that the contract under consideration, and which was entered into by independent dealers and manufacturers in the same line of business, as already stated, imposed or attempted to impose unreasonable and too extensive restrictions upon trade and the freedom of the parties thereto, and was consequently contrary to public policy and void. We think that its manifest purpose and natural tendency were to prevent competition in too many localities, and to reduce the price of the raw materials upon the one hand as they might choose, and upon the other to enhance that of the manufactured products by artificial means, to the disadvantage and detriment of the public. 1 Whart. Con., sec. 442, and notes; Callaghan v. Donnolly, 45 Cal., 152; Salt Co. v. Guthrie, 35 Ohio St., 666; Sampson v. Shaw, 101 Mass., 145; Wright v. Ryder, 36 Cal., 342, 361; Hooker v. Vandewater, 47 Am. Dec., 258; Craft v. McConoughy, 79 Ill., 346; Leonard v. Poole, 114 N. Y., 371 (based on statute). See also, for a collation of the authorities, note to Angier v. Webber, 92 Am. Dec., 751. Our present statute against trusts and combinations of every character in restraint of trade, etc., was not in force when the contract now before us was executed, and is not, therefore, applicable to the question. Acts 1889, p. 141.

We think that the judgment should be affirmed.

*Affirmed.*