CASE 70.—ACTION BY MERCHANTS ICE & COLD STORAGE COMPANY AGAINST JOHN ROHRMAN.—May 18, 1910.

## Merchant's Ice & Cold Storage Co. v. Rohrman.

Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

SAMUEL B. KIRBY, Judge.

Judgment for defendant, plaintiff appeals.—Affirmed.

1   Monopolies—Restraint of Trade—Statutes.—Complainant's predecessor purchased ice plants and the output of ice of manufacturers in L. until it controlled all the ice manufactured for public use except 5 to 10 per cent., such absorption being accomplished by promoters, receiving for their services stock in the corporation, all being purchased under contract requiring their owners not to again engage in the ice busi ness in the county for 10 years except for the corporation without its consent. After this consolidation was accomplished, plaintiff ice company was organized, and purchased all the business and property of the consolidated company. Held that, though plaintiff did not raise the existing rea-

Merchants' Ice & Cold Storage Co. v. Rohrman.

sonable price of ice or attempt to control the output or price charged by the few remaining independent factories, the contract was part of a scheme to control the ice business in L. and was void as an unreasonable restraint of trade both under Ky. St. section 3915, prohibiting trusts and combines, and independent thereof.

2. Monopolies—Restraint of Trade—Succession of Corporations. —Where a corporation created a monopoly of the ice business in L. by the amalgamation of practically all the ice plants in the city, and then all such property was conveyed to a new corporation organized as its successor composed largely of the same interests, the new corporation was not an innocent purchaser, and was therefore not entitled to enforce the monopolistic contracts of its predecessor on the theory that it was not guilty of any impropriety.

3. Monopolies—Consolidation—Fixing Price.—Where contracts looking to the consolidation of ice manufacturing plants in L. were intended for the purpose of controlling the market and suppressing competition, it was immaterial to their invalidity that no effort was in fact made to control, raise, or fix the price of ice in that market.

GIBSON, MARSHALL & GIBSON and DODD & DODD for appellant.

L. S. LEOPOLD and KOHN BAIRD, SLOSS & KOHN for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This action was brought by the appellant ice company to restrain the appellee Rohrman from violating a contract entered into by him, in which he obligated himself not to engage for a period of 10 years in the business of manufacturing or selling ice in Jefferson county, Ky. Rohrman in his answer set up several defenses, but we deem it necessary only to notice the one pleading that the contract was illegal in restraint of trade and against public policy. Upon hearing the case, the chancellor dismissed the petition, and this appeal is prosecuted from the judgment.

To understand fully the nature of the case it will be necessary to relate somewhat in detail the facts disclosed by the record. On the 1st day of March, 1905, the National Ice & Cold Storage Company, a corporation engaged in the manufacture and sale of ice, sold its plant, good will, and business to the Merchants' Refrigerating Company, a corporation organized under the laws of this state in April, 1904, for the purpose of manufacturing and selling ice and carrying on a cold storage business. On the 25th of March, 1905, a few days after its purchase of the National Ice & Cold Storage Company, the Merchants' Refrigerating Company by amended articles of incorporation increased its capital stock from $200,000 to $1,000,000. On January 2, 1906, the appellant Merchants' Ice & Cold Storage Company was incorporated with a capital stock of $1,500,000. It may here be noted that the principal stockholders in each of these companies were the same persons, and that Charles H. Inman was the president of each of them.

It is averred in the petition that prior to the said "1st day of March, 1905, the Merchants' Refrigerating Company had been incorporated and organized at the instigation of and for the benefit of the persons interested in the National Ice & Cold Storage Company, including the defendant Rohrman and others, for the purpose of acquiring the plant, good will, and business of the said National Ice & Cold Storage Company, and the plants, business, and good will of other ice manufacturers of Louisville, with a view to consolidating them under one management and control through and by the said Merchants' Refrigerating Company." And, further, that "the Merchants' Ice & Cold Storage Company was incor-

porated in January, 1906, at the instigation of and for the benefit of the persons interested as stockholders in the Merchants' Refrigerating Company, for the purpose of having the said Merchants' Ice & Cold Storage Company acquire the assets and contracts of the Merchants' Refrigerating Company and other manufacturers of ice, and continue their business. * * * And that the Merchants' Ice & Cold Storage Company on the 9th of January, 1906, acquired and had conveyed to it all of the real estate of the Merchants' Refrigerating Company, and paid a large consideration therefor, of which the defendant Rohrman received his due proportion."

The Merchants' Refrigerating Company, in pursuance of the plan for which it was organized, purchased the plant, business, assets, and good will of the National Ice & Cold Storage Company under the following contract, which was signed by all of the stockholders, including the appellee Rohrman: "This article of agreement, made and entered into by and between the National Ice & Cold Storage Co., and the undersigned stockholders thereof, parties to the first part, and the Merchants' Refrigerating Company, party of the second part, of the city of Louisville, Jefferson county, Kentucky, Witnesseth: That whereas the said National Ice & Cold Storage Co., has sold, transferred, and delivered to the second party its certain real estate, with the improvements thereon, situated in the city of Louisville, Jefferson county, state of Kentucky, and all the machinery, fixtures, furniture, wagons, horses, harness, and all other property of every kind or description, connected with or used in its business of dealing in, manufacturing and delivering of ice, together with the good will and business of the said first parties

as dealers in and manufacturers of ice for the sum of one hundred and sixty-six thousand four hundred sixty-four and 66-100 dollars. Now, therefore, in consideration of said sale to and purchase by said second party, and in order that the said second party may be secure in the full enjoyment of the good will of said first parties, said first parties do severally agree that they will not, nor will either of them, for a period of ten years from the first day of April, 1905, without the consent of the said second party directly or indirectly, as principal, agent or employe, engage in the business of manufacturing or selling ice within Jefferson county, Kentucky, except in the service of said second party. Executed at Louisville, Kentucky, this 1st day of March, 1905. Henry Vogt. Adam Vogt. National Ice & Cold Storage Co., by Chas. W. Inman, Pres. & Treas. Chas. W. Inman. John Rohrman. Sam Ouerbacker. John Ouerbacker. Jos. P. Ouerbacker. John Rohrman. Merchants' Refrigerating Co., by Chas. W. Inman, Pres. & Tr.''

In the contract by which the Merchants' Ice & Cold Storage Company purchased the property and assets of the Merchants' Refrigerating Company, it is stipulated that the Merchants' Refrigerating Company transfers to it, ''All its good will and the good will of others acquired by it, including all contracts pertaining to and taken in connection with the acquisition of the good will of others, with the right in the buyer to enforce in its behalf all such contracts to the same extent as the seller could do had it continued in business, it being understood that the said contracts are a material part of the consideration received by the buyer under its contract with the seller.''

In addition to what may be termed the consolidation of the three plants mentioned, the Merchants' Refrigerating Company between the time of its absorption of the National Ice & Cold Storage Company in 1905, and the sale of its plant to the Merchants' Ice & Cold Storage Company in January, 1906, had purchased the property of all the ice plants in Louisville, engaged exclusively in the manufacture of ice, except the Inman Ice Company that had a capacity of 35 tons. In addition to this, it arranged to and did purchase the output of nearly all the concerns that manufactured ice in connection with their business and sold the surplus. These various plants purchased, as well as the contracts for the output, were turned over to the Merchants' Ice & Cold Storage Company, when it took over the Merchants' Refrigerating Company.

There is also some evidence that the price at which peddlers or distributors of ice sold the same was fixed by the appellant company; and they were notified that unless the prices so fixed were maintained they would be charged a higher rate for ice than they had been paying. It does not appear, however, that any attempt was made to increase the price above its fair value, or to dictate to the independent companies the price at which ice should be sold by them. The officers of the appellant company deny that they had any intention of controlling the manufacture or price of ice in Louisville, and insist that the only purpose in buying up some plants and the product of others was to organize the business upon a satisfactory and paying basis, and cut down the expense of carrying it on.

Without stating further in detail the evidence, we may summarize as follows the facts as we gather them from the record: (1) At the time the Mer-

chants' Refrigerating Company commenced to purchase ice plants and the output of ice, there were in operation in the city some 15 independent ice factories, and in addition some 7 other concerns that sold a large part of their product to the public, and between these various factories there was active competition. (2) After the absorption of all the plants it could purchase or control, the Merchants' Refrigerating Company owned or controlled all the ice manufactured in Louisville for the use of the public, except 5 or 10 per cent. thereof. (3) The absorption of these various plants was accomplished in behalf of the Merchants' Refrigerating Company by Webber and Cox, who each received for their services $5,000 worth of stock in this company. (4) These various plants were purchased under a contract similar to the one made with Rohrman. (5) The principal stockholders in the National Ice & Cold Storage Company, the Merchants' Refrigerating Company, and the Merchants' Ice & Cold Storage Company were the same persons; and Charles W. Inman was the president and controlling spirit in each of them. (6) The Merchants' Refrigerating Company was organized to take over all the ice plants in Louisville that it could purchase or control. (7) The Merchants' Ice & Cold Storage Company was organized for the purpose of taking over the Merchants' Refrigerating Company, and all of the factories and product that it had purchased, as well as other factories engaged in the ice business, and although this last-named company was not organized until January, 1906, it is yet manifest that the purpose of its organization was to control the ice business in Louisville. (8) The purchase of the National Ice & Cold Storage Company was merely a

part of the plan and scheme conceived by Inman and his associates to obtain by purchase or otherwise control of all the plants in the city, and thereby fix and regulate the price as well as the output of ice. (9) The price of ice was not raised above its fair or reasonable value by either the Merchants' Refrigerating Company or the Merchants' Ice & Cold Storage Company; nor was it attempted to control the output of the few independent factories or the price at which they sold their product.

From these facts, our conclusion is that the contract was not only unenforceable because in violation of the statute before its amendment by the act of 1906, Commonwealth v. International Harvester Company of America, 131 Ky. 551, 767, 115 S. W. 703, but it was void as an unreasonable restraint of trade independent of the statute. The statute, which is section 3915 of the Kentucky Statutes, reads as follows: "That if any corporation under the laws of Kentucky, or under the laws of any other state or country, for transacting or conducting any kind of business in this state, or any partnership, company, firm or individual, or other association of persons, shall create, establish, organize or enter into, or become a member of, or a party to, or in any way interested in any pool, trust, combine, agreement, confederation or understanding, with any other corporation, partnership, individual or person, or association of persons, for the purpose of regulating or controlling or fixing the price of any merchandise, manufactured articles or property of any kind, or shall enter into, become a member of, or party to or in any way interested in any pool, agreement, contract, understanding, combination or confederation, having for its object the fixing, or in

any way limiting the amount or quantity of any article of property, commodity, or merchandise to be produced or manufactured, mined, bought or sold, shall be deemed guilty of the crime of conspiracy, and punished therefor as provided in the subsequent sections of this act."

The learned judge of the lower court, in a well-written opinion holding that the contract was in violation of this statute, said: "It was the rule of the common law that any scheme to corner the market by getting control of the available supply is illegal, and so all contracts made in promotion of such scheme are unenforceable. If the common law rule, as thus announced, is not sufficient to dispose of the question at bar, it would seem that the Kentucky statute is violated, and renders the contract sought to be enforced by the plaintiffs void. Corporations in this country are simply aggregations of men for the purpose of conducting business, and for the convenience of those interested in the business are substituted for partnerships. There is a marked distinction between a corporation created under the laws of the state and the old corporation created by act of the Legislature. Under the laws of this state any small number of men otherwise engaged in a partnership enterprise, may, by proceeding under the statute, incorporate themselves. The ease and facility with which corporations are created in this age have made them a shield and a blind for many purposes, and the rule of the courts throughout the country is not to look at the form of such transaction but to the substance. Thus the motives which inspire the incorporators or the stockholders of a corporation will be inquired into, and the court will act upon the facts as found, without regard to the form of

the transaction.   Where, therefore, one corporation is created for the purpose of taking over a number of other corporations, issuing stock, or even paying for the property, with a view  of  establishing  a monopoly, trust, or combination, the form of  the transaction will be disregarded and the intent of the parties will be looked to.   *   *   *   Thus the Merchants' Refrigerating Company and the Merchants' Ice & Cold Storage Company were created for the purpose of taking over all other ice concerns which would sell to them, and did take over all which they could possibly buy, and pursuant to the general intent, it did arrange to take the surplus output of other concerns.   It will be noted that the statute in Kentucky denounces any 'agreement' for the purpose of. regulating, controlling or 'fixing the price' of any merchandise, etc.   The taking over of the several corporations, the making of contracts, such as the one declared upon by plaintiffs, are all in the nature of agreements, and the ultimate result was the 'fixing of the price' at which the ice output was to be sold. It is not necessary that the combination shall have increased the price beyond its real value, or have depreciated the price below its value.   For the vice in the contract, not as shown by the contract itself, but by all the attendant circumstances, it seems to me, the defendant who is equally in fault with the plaintiffs, and indeed places himself beyond the sympathy of the court, cannot be enjoined from violating the contract.   Applying the well-established principles of law, the court must leave the parties where it finds them, without giving either relief.   The contract could not be enforced by Rohrman, nor should it be enforced by the plaintiffs, and the fact that he has profited largely by the contract, having sold

interest in the National Ice & Cold Storage Company, and otherwise profited by their manipulations, cannot avail the plaintiffs.''

In addition to this the contract had for its purpose an unreasonable restraint of trade, and hence the courts will not enforce it at the instance of either party. It is too well settled to need more than the mere citation of authority that a contract in reasonable restraint of trade is valid. Pyke v. Thomas, 4 Bibb, 486, 7 Am. Dec. 741; Turner v. Johnson, 7 Dana, 435; Sutton v. Head, 86 Ky. 156, 5 S. W. 410, 9 Ky. Law Rep. 453, 9 Am. St. Rep. 274; Western District W. Co. v. Hobson, 96 Ky. 550, 29 S. W. 308, 16 Ky. Law Rep. 869; Stovall v. McCutchen, 107 Ky. 577, 54 S. W. 969, 21 Ky. Law Rep. 1317, 47 L. R. A. 287, 92 Am. St. Rep. 373; Louisville Board of Fire Underwriters v. Johnson, 133 Ky. 797. Or as said in Beech on Modern Law of Contracts, vol. 2, section 1562: ''It is a well-settled doctrine that any agreement in restraint of trade is void as being against public policy, unless founded upon a valuable consideration, and as regards time, space, and the extent of trade limited to what is reasonable under the circumstances of the case for the reason that such contracts tend to deprive the public of the services of the parties in the employments and capacities in which they are most useful, and so tend to expose the public to the evils of monopoly. Many authors declare, in substance, that all restraints are presumed to be bad, but if the circumstances are set forth that presumption may be excluded, and the courts judge of these circumstances, whether the contract be valid or not.'' Therefore, if the contract in question was in reasonable restraint of trade, and there was no other objection, it follows that the courts would en-

force it as a valid contract. But, in our opinion, this contract was not in reasonable restraint of trade, and we will proceed to state the reasons for this conclusion.

At the outset, it may be observed that it is difficult to draw the line between contracts in partial restraint of trade that are recognized as legitimate by all the courts, and contracts having for their purpose the control of the market for an article or commodity, and consequently the suppression of competition, which are condemned by the courts as either monopolies, trusts, or conspiracies, or as being in restraint of trade. Every purchase of a competitor in any trade or business under an agreement that the seller will not for a specified time engage in the same trade or business in that territory is at least the partial suppression of competition, and gives to the purchaser a larger control of the market for the article or commodity involved in the transaction than he had before. And it is fair to assume that, in all transactions like this, one of the reasons for the purchase is to remove competition. But although this may be so, it will not of itself render the contract invalid. If this feature or fact would invalidate such contracts, then all of them would be void. To render a contract invalid, there must be some other object in view than the mere purchase of a competing business; and the natural consequence of the purchase must be to control the market or suppress competition. But, even if this should be the natural result of the purchase from a business or trade standpoint, it would not in every case or under all conditions render the contract of purchase invalid. There are and must in the necessity of the case be exceptions to the rule, and these exceptions must be dealt with

as they come up. For instance, if there were only two merchants in a town, and one of them should buy the other out, it might result in a condition of affairs in that particular community that would leave only one person engaged in the mercantile business and give him control of the immediate market, and yet the circumstances and conditions surrounding the transaction might be such as to exempt it from the operation of the rule condemning contracts that have the effect of placing in the hands of one person control of an article, trade, or business. In other places, and in reference to other things, the purchase by cne concern of a half-dozen plants or establishments might not except in a measure affect competition, and would not enable the purchaser to control the market, and this would not be the purpose in view in making the purchase. It can therefore be seen that it is easy enough to suppose or even describe conditions in which the purchase of a competing plant or business would not have the effect of creating a situation that would come within the condemnation of the law, and also that it would not be difficult to set down conditions that would make the transaction illegal without reference to the number of competitors that were purchased. The textbooks on contracts are full of cases in which this question in one form or another has come before the courts, but it would not accomplish any useful purpose to undertake to differentiate them in this opinion. In the able and elaborate opinion rendered by Judge Taft in United States v. Addyston Pipe & Steel Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122, as well as in the full note to Harding v. American Glucose Co., 182 Ill. 551, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. Rep. 189, a discussion of the principles underlying this question may be found.

The safe and just plan is to deal with each particu-·
lar case as the facts and conditions presented seem
to demand, protecting the good while punishing the
bad.  The question is too delicate and involves too
many important rights to 'attempt an accurate state-
ment of principles that might be applied to each case.
On the one side, we have the inalienable right of the
citizen to contract, and buy and sell, in the open
market that which is the legitimate subject of barter
and sale, and this privilege should not be abridged
without good reason.  On the other side, we have the
interest of the public that must be protected, even
though it cost a part of the liberty of the individual.
It is not the purpose of the law to control or hinder
enterprising, energetic men, with brains or capital,
from developing an industry or building up a great
trade or business.  The largest freedom in commer-
cial enterprises compatible with the public  good
should be allowed.  And so there should be no inter-
ference with the right to contract or to buy or sell
unless it is apparent that the main purpose and rea-
sonable effect of the contract is to create a condition
of affairs that will enable the purchaser to control
the market, destroy competition, and create a condi-
tion incompatible with the public good.  As well said
by the Supreme Court of Indiana in Knight & Jillson
Co. v. Miller (Ind.) 87 N. E. 823:  ''The true test
is whether the contract or combination in its ap-
parent purpose and natural consequence places a re-
striction upon competition or tends to  create  a
monopoly or is inimical to trade or commerce, and
it is not necessary that a pure monopoly is effected,
or that the restraint be a complete one.  *  *  *  But
the control of commodities, which are necessities of
life, or of material necessary or essential to build-

ing, or to sanitary regulations, or of subjects of legitimate trade affecting the interests of the public or the interests of any particular class of citizens, either as producers, dealers, or consumers, to the extent that it either does or tends to prevent or restrain competition, cannot be justified.'' To the same effect is Texas Standard Oil Co. v. Adoue, 83 Tex. 650, 19 S. W. 274, 15 L. R. A. 598, 29 Am. St. Rep. 690.

Monopolies since the earliest times have been condemned by the courts, and contracts such as the one we are considering having for their purpose the control of the market and the suppression of competition are nothing more nor less than an effort to create a monopoly, and at the same time place an unlawful restraint upon trade. How to deal with the ever-growing problem involved in the attempt to suppress monopolies and combinations that have for their purpose the control of various lines of trade and industry that are close to the material needs and welfare of the people has become a matter of great public concern. Many attempts have been made by Legislatures and courts to prevent and put down efforts to get control of a useful article or commodity, but all of them have apparently proved unavailing. These illegal combinations appear in so many forms and in so many different guises that it is a difficult task to keep them under the surveillance of the law. When driven from one place of vantage by vigilance of Legislatures with the assistance of the courts, they at once seek another that seems to offer security from prosecution. As an illustration of the ingenuity in devising plans to evade the law against monopolies and combinations this case is a fair example. Here an effort is made to

accomplish by indirect methods what would be in another shape easily marked for condemnation. The contention being that as the appellant Merchants' Ice & Cold Storage Company was not incorporated until 1906, about a year after the contract between Rhorman and the Merchants' Refrigerating Company was entered into, and was not a party to the contract, it should not be charged with or held responsible for the vice in it. It is said it only took over the Merchants' Refrigerating Company and all the properties owned by it, and so should not be made to bear the burden of the wrongdoing of that concern. There would be more force in this argument if the Merchants' Ice & Cold Storage Company occupied the position of what we may call an innocent purchaser. But it does not hold this place of advantage. It was organized by and is substantially owned by the persons who owned the Merchants' Refrigerating Company. Its creation was merely the last step in the plan conceived by the Merchants' Refrigerating Company to control the ice market. As it took over the Merchants' Refrigerating Company with full knowledge of what it had done in this direction, it will not be heard to say that its hands are clean of any complicity in the scheme partially perfected by the Merchants' Refrigerating Company, and then delivered with all the vice connected with the transaction to its successors the Merchants' Ice & Cold Storage Company to put it into full execution. If this kind of subterfuge were allowed there would be little use in trying to check monopolies or put the seal of condemnation upon contracts to control the market. It would only be necessary when any corporation or concern had obtained control of the market to dispose of its

holdings to another and new corporation, thus evading the law, and making legal an obnoxious transaction.   There is no merit in this contention, and we will treat the case as if the contract with Rohrman had been made with the Merchants' Ice & Cold Storage Company in place of its predecessor the Merchants' Refrigerating Company.   Considered from this standpoint, let us look into this contract.   As an independent transaction, distinct from the plan of which it was a part, we see no objection to it.   On its face it only provides for a reasonable restraint of trade.   It was merely one business concern sell-. ing out to another, and so, if this was all, the contract would be free from objection, and we would grant the relief sought.   But the validity of this particular contract cannot be determined by looking at it alone.   It must be considered in connection with the others of which it was and is a part, and when so considered in connection with the circumstances under which it was entered into and the conditions that gave rise to its execution, we find that it was only one of a number of like contracts secured about the same time by the Merchants' Refrigerating Company in furtherance of the purpose to obtain control of the ice market and effectually destroy substantial competition.   In short, we think it is plain that the purpose in the minds of the parties to this transaction was to purchase the National Ice & Cold Storage Company and Rohrman's interest therein, as a link in the chain that would finally bind all the consumers of ice in Louisville to the wheels of a single concern, thereby creating a condition that would enable the purchaser to control the market and stifle if not suppress competition.

If the owners of all the ice plants in Louisville that were purchased by the   Merchants'   Refrigerating

Company had, while each was owning and operating his plant, entered into a trust agreement among themselves to control the market and fix the price, although the price might be reasonable, there would be little doubt about the invalidity of the contract. And the fact that this condition is brought about by the employment of other methods, cannot exempt the purchaser from the operation of the rule of invalidity that would be applied if merely a trust agreement between these independent concerns had been entered into. In both instances the purpose would be the same—the object in the minds of the promoters identical—the only difference being in the means employed by which the same end was to be accomplished. If a contract is made that suppresses competition, and controls the market, and that contract is entered into between those who have theretofore engaged in competition in the market sought to be controlled, it is a contract in restraint of trade. It may be more. It may amount to a trust or conspiracy or a monopoly, but it is nevertheless a contract in restraint of trade. To restrain trade is the essential feature of the contract—the reason why it was made. If trade that is in competition could not be restrained, the promoters would not go into the scheme; and when such a contract is made, whatever form it may assume, or by whatever name it may be called, and although it may be reached under the law of monopolies, trusts, and conspiracies, it will be declared void as being in unreasonable restraint of trade. Said the United States Supreme Court in Addyston Pipe, etc., Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136: ''We have no doubt that where the direct and immediate effect of a contract or combination among particular dealers

in a commodity is to destroy competition between them and others, so that the parties to the contract or combination may obtain increased prices for themselves, such contract or combination amounts to a restraint of trade in the commodity, even though contracts to buy such commodity at the enhanced price are continually being made. Total suppression of the trade in the commodity is not necessary in order to render the combination one in restraint of trade. It is the effect of the combination in limiting and restraining the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity, that is regarded.''

Some law writers have attempted to make nice distinctions between these different classes of illegal schemes and insist that each class should be kept in a separate column and treated apart from the others. And so there has been some criticism of the modern tendency to bring cases like this within the doctrine governing contracts in restraint of trade upon the ground that the offense partakes of the nature of a trust, monopoly, or conspiracy rather than a restraint upon trade as the law in reference to restraint is generally understood. But, in our opinion there seems no good reason why a case should not be treated as an illegal restraint of trade when such is its effect. And so it is not important how this control of the market or suppression of competition is effected. It is the result that the law looks at and seeks to correct, and not the means by which it is accomplished. It is not worth while to make any nice distinctions in matters like this. At last and in all events, the question in so far as it relates to restraint upon trade comes down to the proposition

whether the restraint is reasonable or not.  If it is, it is legal; if it is not, it is illegal.

The views we have expressed are directly at variance with the opinion of the New Jersey Supreme Court in Trenton Potteries Co. v. Oliphant, 58 N. J. Eq. 507, 43 Atl. 723, 46 L. R. A. 255, 78 Am. St. Rep. 612, strongly relied on by counsel for the appellants. In that case the court upheld a contract identical, in the circumstances and conditions surrounding it, with the one involved in this case, and, in the course of the opinion, said: "A person engaged in any manufacture or trade, having the right to acquire and possess property, and to do with it what he chooses, may lawfully buy the business of any of his competitors.  His first purchase would at once diminish competition.  If he continued to purchase, each succeeding transaction would remove another competitor.  If his capital was large enough to enable him to buy the business of all competitors, the last purchase would completely exclude competition, at least for a time.  But in the absence of legislative restrictions, if such could be imposed, upon the acquisition of such property, and its use when so acquired, courts could impose no limitations.  They would be obliged to enforce such contracts, notwithstanding the effect was to diminish, or even to exclude competition.  *  *  *  Under our liberal corporation laws, corporate authority may be acquired by aggregation of individuals, organized as prescribed, to engage in and carry on almost every conceivable manufacture or trade.  Such corporations are empowered to purchase, hold, and use property appropriate to their business.  They may also purchase and hold the stock of other corporations. Under such powers it is obvious that a corporation may pur-

chase the plant and business of competing individuals and concerns. The Legislature might have withheld such powers, or imposed limitations upon their use. In the absence of prohibition or limitation on their powers in this respect, it is impossible for the courts to pronounce acts done under legislative grant to be inimical to public policy. The grant of the Legislature authorizing and permitting such acts must fix for the courts the character and limit of public policy in that regard. It follows that a corporation empowered to carry on a particular business may lawfully purchase the plant and business of competitors, although such purchases may diminish, or for a time, at least, destroy, competition. Contracts for such purchases cannot be refused enforcement. Since contracts by individuals, and by corporations having legislative authority, for the purchase of competing plants and business, may be made, and are enforceable, although, as a result thereof, competition is diminished or temporarily destroyed, it further follows that contracts reasonably required to make such purchases effective by protecting the purchaser in the use and enjoyment of the thing purchased cannot be declared by the courts to be repugnant to public policy.''

And it must be admitted that this case fully sustains the contention of counsel, and if recognized as authority by us would uphold the contract here sought to be enforced. But we cannot give our approval to the doctrine announced by the New Jersey court. It is not only entirely at variance with our public policy as often declared both by the legislative and judicial departments of the state, but is contrary to the great weight of authority. Indeed we have not found any case that goes so far in an effort

to promote trusts and encourage monopolies. The true and prevailing doctrine on this subject being well expressed by the Michigan Supreme Court in Richardson v. Buhl, 77 Mich. 632, 43 N. W. 1102, 6 L. R. A. 457, where it is said: "Monopoly in trade or in any kind of business in this country is odious to our form of government. It is sometimes permitted to aid the government in carrying on a great public enterprise, or public work under governmental control, in the interest of the public. Its tendency is, however, destructive of free institutions, and repugnant to the instincts of a free people, and contrary to the whole scope and spirit of the federal Constitution, and is not allowed to exist under express provisions in several of our state Constitutions. * * * It is always destructive of individual rights, and of that free competition which is the life of business, and it revives and perpetuates one of the great evils which it was the object of the framers of our form of government to eradicate and prevent. It is alike destructive to both individual enterprise and individual prosperity, whether conferred upon corporations or individuals, and therefore public policy is, and ought to be, as well as public sentiment, against it." And by our court, in Anderson v. Jett, 89 Ky. 375, 12 S. W. 670, 11 Ky. Law Rep. 570, 6 L. R. A. 390, where it is said: "Rivalry is the life of trade; the thrift and welfare of the people depend upon it; monopoly is opposed to it all along the line; the accumulation of wealth out of the brow sweat of honest toilers by means of combinations is opposed to competing trade and enterprise. That public policy that encourages fair dealing, honest thrift and enterprise among all the citizens of the commonwealth, and is opposed to monopo-

lies and combinations, because unfriendly to such fair dealing, thrift, and enterprise, declares all combinations whose object is to destroy or impede free competition between the several lines of business engaged in, utterly void."

The argument is further made that the contract should be upheld because the purpose of the purchase was only to economize in the cost of producing and selling ice and prevent competition that was destructive to the conduct of the business, and not to fix, regulate, or raise the price of the article. And it is true there is no evidence that any attempt was made to raise the price of ice. But the mere fact that no effort was made to control or fix or raise the price has little to do with the question. It is the purpose to control the market and suppress competition that constitutes the essential vice in the contract. It would not, however, be out of place to observe that the probability of an advance in the price of an article of necessity is always imminent when there is no competition and the market is controlled by one person. It is an easy step from the point at which the control of a product is accomplished to the place at which the making of an increase in the price begins. When the unrestricted control of an article or commodity is placed in the hands of an individual or corporation, there are few who can or will resist the temptation to avail themselves of the opportunity afforded to make as much profit out of the enterprise as the business will stand. That it would be inimical to the public good to have the ice business in a city the size of Louisville in the hands of one concern is, we think, a proposition so plain as not to need argument in support of it. Ice in large cities is one of the common necessaries of life. It is an article

which on account of its perishable qualities and the loss and expense attending its shipment affords exceptional opportunities for creating a monopoly in its manufacture and sale at the place it is used. It is easier to obtain control of the market and suppress competition in the sale of ice than almost any other article in general use. It would be almost impossible for one concern to control the dry goods, the grocery, the boot and shoe, or the hardware or other like businesses in a large city, as goods of this character can easily be obtained at any time from other places by persons who need them, and the character of the business is such that any person with a small capital can soon set himself up in business. But the manufacture of ice requires the investment of a large sum of money to establish even a small plant. It cannot, without great deterioration, as well as expense, be imported from outside points to the place at which it is to be used. And so if it was permissible to make any discrimination between attempts to monopolize a trade or industry, it would not be amiss to single out ice as one of the articles to which the discrimination might well be applied, and the most stringent rule adopted to prevent monopoly.

The case for the appellant, tested by every rule applicable in cases of this character, falls well within the condemnation of the law, and the judgment denying it any relief must be affirmed.