24092. BURRUS MOTOR COMPANY *v.* PATTERSON-POPE MOTOR COMPANY *et al.*

DECIDED FEBRUARY 20, 1935.

*George C. Palmer,* for plaintiff in error.

*Hewlett & Dennis, Colquitt, Parker, Troutman & Arkwright, Alexander Bush,* contra.

MACINTYRE, J. Patterson-Pope Motor Company brought an action for damages against Ford Motor Company, Burrus Motor Company, Perry Burrus, and J. H. Wood Jr. By amendment the plaintiff dismissed its action against Perry Burrus and J. H. Wood Jr., and the case proceeded against the other two defendants. The jury returned a verdict against Ford Motor Company alone, thus finding in favor of Burrus Motor Company. Patterson-Pope Motor Company filed its motion for a new trial, the motion was sustained, and Burrus Motor Company excepted. Error is assigned upon the ground that the evidence demanded a verdict in favor of Burrus Motor Company. The exception is sought to be justified, first, because the evidence fails to connect Burrus Motor Company with the alleged conspiracy; and second, for the reason that even though the evidence does connect the Burrus Motor Company with said conspiracy, no legal wrong was committed by the defendants, or either of them, for which an action would lie. For the purposes of this decision, the following is a sufficient statement of the case made in the plaintiff's petition:

J. H. Wood Jr. was manager of the Atlanta Branch of the Ford Motor Company, "and his duties . . required him to . . make contracts appointing authorized Ford dealers, and to recommend the termination of contracts with dealers. Burrus Motor Company was the authorized dealer of Ford products throughout Muscogee County, Georgia, with its principal office . . in Columbus, Georgia." Perry Burrus was the "vice-president of said Burrus Motor Company, and was actually engaged in the management and conduct of its affairs." From September 1, 1928, to September 1, 1930, "petitioner was an active competitor of Burrus Motor Company, . . maintaining its office in Columbus, Muscogee

County, Georgia." Through honest and efficient methods "petitioner had established an enviable reputation as a reliable dealer in Ford cars, and for the fiscal years beginning September, 1928, and September, 1929, . . sold 264 new Ford passenger-cars to the trade." During said period "petitioner sold approximately as many cars as did . . Burrus Motor Company, the authorized agent . . of . . Ford Motor Company, and . . became an active competitor of said Burrus Motor Company, and, as a result thereof, Perry Burrus complained to Ford Motor Company through defendant J. H. Wood Jr., its representative, requesting that . . Ford Motor Company make an effort to cut off the source of supply of defendant's products to petitioner. Pursuant to said complaint and request, Ford Motor Company sent its investigators . . to Muscogee county to inquire into petitioner's business in the acquisition and sale of new Ford cars." Said investigation revealed that "petitioner did not engage in . . price-cutting or other unlawful methods in the sale and distribution of said new cars." Well knowing that it had no control of petitioner's affairs so long as the latter was not an authorized Ford dealer, Ford Motor Company through its representative, J. H. Wood Jr., and defendant Burrus Motor Company through Perry Burrus, unlawfully conspired together to destroy petitioner's business of selling new Ford cars and ruin its business influence, credit, and reputation, in order to secure for Burrus Motor Company the exclusive business of selling Ford products in the aforesaid territory. This conspiracy consisted in an agreement that Ford Motor Company through its agent, the said Wood, was "to fraudulently and wrongfully induce petitioner to . . enter into a contract to become an authorized Ford dealer, with all the attendant obligations, which contract was ostensibly to be made in good faith, but with the secret, fraudulent, wicked, and wrongful mental reservation . . to cancel said contract after petitioner had incurred the expense of installing single-purpose machinery, leased a location suitable for Ford Company's products, and entered into various advertising contracts to aid the sale of same." Defendants well knew that the cancellation of such contract would cause petitioner great financial loss and destroy its reputation as a reliable business concern.

Pursuant to said conspiracy, it was further agreed between defendants that, "as an ostensible excuse for cancelling said contract,

defendant Wood was to maliciously and unlawfully and falsely report to defendant Motor Company . . that petitioner . . was financially unsound and unstable, well knowing the report to be untrue, false, and defamatory; that thereupon defendant Burrus Motor Company and defendant Perry Burrus would circulate . . malicious and untruthful rumors in . . Columbus and throughout Muscogee County . . that defendant Motor Company was dissatisfied with petitioner as a dealer, and that soon the contract of the latter would be cancelled, and said Burrus Motor Company would again become the sole and exclusive agent of defendant's product in Muscogee County." In pursuance of said conspiracy, "defendant Ford Motor Company through its agent, . . J. H. Wood Jr., induced petitioner, on September 3, 1930, to enter into a contract whereby petitioner became an authorized Ford dealer in Ford products in Muscogee County." Petitioner entered into said contract in the utmost good faith, without any knowledge of said conspiracy. "Among other things, defendant Ford Company required its authorized dealers to meet certain common requirements which included procuring a place suitably located as a salesroom and service-station acceptable to defendant Ford Company, the installation of special single-purpose repair machinery and tools, the carrying of an adequate stock of Ford parts for the repairing and replacement of Ford products, and the maintenance of a high-grade repair service whereby repairs on defendant's products were to be made in a workmanlike manner." When Ford Motor Company, through its agent Wood, entered into said contract with petitioner, "it did so with the wrongful and fraudulent purpose of causing petitioner to go to the expense and trouble of meeting said common requirements as aforesaid, after which said contract was to be cancelled, thus causing petitioner to suffer great financial loss, as well as injury and destruction to its business reputation, all for the unlawful purpose of making it impossible for petitioner to again reestablish itself in its former business of dealing in Ford cars in Muscogee County, Georgia. In conformity with said common requirements, petitioner, although it was occupying the premises at 1328 First Avenue in Columbus, Georgia, under a lease which expired in September, 1932, and which premises were adequate, in so far as petitioner's business was concerned, leased premises at 1501 First Avenue, Columbus, Georgia, into which it moved, there-

by incurring a loss of $2400 for the year ending September 1, 1931," and did other designated things at great expense.

"Petitioner in good faith conformed to all the common requirements of . . Ford Company, but, pursuant to said conspiracy . . to destroy petitioner's business, defendant J. H. Wood Jr., some time in 1931, . . falsely and maliciously informed the home office of Ford Motor Company that petitioner was . . practically insolvent and altogether undesirable as a dealer of Ford products. Pursuant to said conspiracy . . Burrus Motor Company, in 1931, . . frequently stated and caused to be circulated through the said Perry Burrus the false, malicious, untrue, and defamatory statement that . . Ford Motor Company was dissatisfied with petitioner as an authorized dealer, and that petitioner was in financial difficulty and defendant Ford Company would soon cancel its dealer's contract with petitioner." Learning of said rumors and reports on or about August 6, 1931, petitioner, through its representatives Patterson and Pope, asked J. H. Wood Jr. if there was an impending concellation of its said contract, stating that petitioner had an opportunity to acquire a Chevrolet agency in Columbus, and said Wood "falsely informed petitioner's representatives aforesaid that he knew of no reason for or the probability of a cancellation of said contract." Said statement of said Wood was false, because he had already recommended the cancellation of said contract for the reasons aforesaid, and "accordingly, on August 8, 1931, petitioner was informed by a representative of defendant Ford Company, one DeForrester, that petitioner's contract as a dealer with Ford Motor Company had been cancelled on August 8, 1931, upon the recommendation of defendant Wood Jr., and for the purported reason that petitioner was financially weak and practically insolvent. Plaintiff requested a reinstatement of said contract with . . Ford Company, and the latter's representative, W. C. Cowling, assured petitioner . . that said contract would be reinstated if, after an investigation by . . Ford Company, the purported reason for a cancellation thereof did not in fact exist. Pursuant thereto . . Ford Company sent its investigator, one Eagan, to Columbus, Georgia, on or about August 22, 1931, and the said Eagan made an investigation into petitioner's financial condition, and . . made his report to . . Ford Company. The purported reason for the cancellation of said contract was un-

founded, . . and said Eagan, on or about August 26, 1931, reported to . . Ford Company that plaintiff was in good financial condition, and he asked petitioner to take no other automobile agency, because its reinstatement as a Ford dealer would thereafter shortly take place." In the meantime, having been notified of the cancellation of its said contract, petitioner, as a percautionary measure, "surrendered possession of the premises at 1501 First Avenue, Columbus, Georgia, with $350 monthly rental, but, relying upon the . . assurances and promises of . . Ford Company, through its representatives Cowling and Eagan, that said contract would be reinstated, provided the investigation showed that petitioner was financially sound, and at the instance of and with the approval of the said Eagan, leased new premises at 1415 First Avenue, Columbus, Georgia, for a period of two years beginning September 1, 1931, at a monthly rental of $150." Relying upon said promises of reinstatement as a Ford dealer, petitioner "was further induced to continue in its employment its entire sales and repair force from August 8, 1931, to October 6, 1931, to its loss and damage of $4500. On or about October 6, 1931, petitioner was informed by . . Ford Company that the contract would not be reinstated, but that the cancellation of same, which took place in the previous month of August, was final." Petitioner's actual damages consist of various named items, aggregating a large sum. "Petitioner brings this suit for the actual damages hereinbefore set out, and shows to the court additionally that the aforesaid conduct of defendants, being attended with aggravating circumstances in both act and intention, as before set forth, entitle petitioner, in addition to the actual losses sustained, to a further sum in the nature of punitive or exemplary damages."

For the purposes of this decision, we deem it only necessary to refer to two provisions of the "sales agreement" entered into between Patterson-Pope Motor Company and Ford Motor Company on September 3, 1930. Paragraph 9(e) reads: "This agreement may be terminated at any time at the will of either party by written notice to the other party given either by registered mail or personal delivery, and such termination shall also operate to cancel all orders therefor received by company and not delivered at date of receipt of said notice." Section 9(f) provides that "this agreement is not assignable by dealer without written assent of company, and no

agent or representative of company is authorized to vary or modify the terms hereof, except by an instrument in writing executed by the parties hereto." "If the verdict was not demanded by the law and the evidence, the Supreme Court will not disturb the first grant of a new trial." *Cox* v. *Grady,* 132 *Ga.* 368. In *Durden* v. *Moore,* 43 *Ga. App.* 423, this court said: "The exception here is to the first grant of a new trial. The verdict was not *demanded* by the law and the facts of the case; and therefore, under repeated rulings of the Supreme Court and of this court, the judgment must be affirmed." Was the verdict in favor of Burrus Motor Company *demanded* by the law and the evidence? In answering this question it is not feasible to attempt to set out with any degree of fulness the voluminous brief of evidence in this case. The general aspects of the case may be gathered from the following abbreviated statement: Beginning in 1928, the plaintiff, Patterson-Pope Motor Company, conducted a retail automobile agency in Columbus, Georgia. Though not an authorized Ford dealer, plaintiff sold Ford automobiles in Columbus and Muscogee County. Burrus Motor Company was the only authorized Ford dealer in Columbus and Muscogee County. Plaintiff sold so many Ford cars in Muscogee County that such sales materially affected the business of Burrus Motor Company, and the latter company urged Ford Motor Company to do something about it. Ford Motor Company said it could not control the situation. The business of selling Ford cars by plaintiff increased. For some time plaintiff had been trying to secure a Ford agency in Columbus, but Ford Motor Company declined to make plaintiff an authorized Ford dealer. Burrus Motor Company had been the only authorized Ford dealer in Muscogee County for several years, and Ford Motor Company appeared to be well satisfied with it. Perry Burrus, who actively controlled Burrus Motor Company, and J. H. Wood Jr., the branch manager of Ford Motor Company in Atlanta, were on very friendly terms. In July, 1930, Ford Motor Company offered to make the plaintiff an authorized Ford dealer in Columbus and Muscogee County. The authorized representative of plaintiff went to Atlanta in September, 1930, to accept the agency. J. H. Wood Jr. was the branch manager of the Ford people in Atlanta, and a Mr. McDonald was his assistant. Before accepting the agency, the representative of plaintiff told McDonald that there were rumors in Columbus to the

effect that Ford Motor Company intended to make plaintiff an authorized agent, load it up with cars and other Ford supplies, and then cancel the agency. McDonald replied that Ford did not do business that way, and said: "You will not be treated that way if you sign it. . . Go ahead and sign it." The contract was then signed. In obedience to the "common requirements" of Ford Motor Company, plaintiff was compelled to move into a larger and more expensive building at an increased rental, and to expend money in various other designated ways.

In the summer of 1931 the plaintiff heard a rumor in Columbus that its contract was to be canceled, and took up the matter with branch-manager Wood in August. Wood denied having any knowledge that the contract would be canceled. Almost immediately after this conference with Wood, plaintiff was notified that its Ford agency had been canceled in accordance with instructions from the home office of Ford Motor Company. When plaintiff's representatives went to Dearborn to contact the sales department of Ford Motor Company, the latter's representative, DeForrest, said that the cancelation was made "purely at the request of Mr. Wood," and that Wood had reported to the home office that plaintiff was in financial trouble. Plaintiff's executives then saw Mr. Cowling, Ford Motor Company's sales executive, and Cowling gave them to understand that an investigation would be made as to the cancelation, and if the facts on which it was based were not true, the cancelation would be rescinded. In the meantime the letter of cancelation, dated August 3, prior to the interview with Wood, reached plaintiff at Columbus. Ford Motor Company instituted an investigation of plaintiff. In the meantime plaintiff's representative told Ford Motor Company's representative that plaintiff had been offered a Chevrolet agency, and was advised that plaintiff would be reinstated, and not to accept the Chevrolet agency. Thereupon plaintiff declined the proffered agency. On October 8 a final order of cancelation was sent to plaintiff, and the agency unqualifiedly revoked.

We come now to some of the testimony which bears more directly upon the question of the alleged conspiracy. B. A. Ansley swore that during the time he was selling automobiles for Burrus Motor Company in the years 1929 and 1930, he accompanied Perry Burrus to Atlanta to see Mr. Wood, the manager of the Atlanta

branch office of Ford Motor Company, to complain about plaintiff's selling Ford cars. We quote from this witness's testimony as follows: "We went to see Mr. Wood. Mr. Wood said there was nothing for him to do about it. . . He said, the other dealers, he didn't have any control over them; he could not stop those dealers from selling to Patterson and Pope; and then he spoke about making them authorized Ford dealers and handling them that way; he would load them up with cars and equipment and break them. . . As to what was said by Mr. Burrus about the appointment of those parties as authorized agents, he didn't agree to it right at first. He said: 'Hell, no.' . . As to what was said later, Mr. Wood said he didn't know how to do anything with them, . . and he says: 'I want to help you. I realize your position, and you realize mine. If you are willing to do that, we can handle it that way; that is the only way we can handle it.' "

The brief of evidence proceeds: "Q. What conclusion did Mr. Burrus come to? A. Mr. Burrus agreed to it. . . Mr. Burrus says: 'Well, if you are sure you can do that, you can carry it through that way, you can do it. . .' I heard him tell his father what took place. He told his father the conversation with Mr. Wood, and Mr. Wood and them agreed to make Patterson and Pope Ford dealers, and then they could break them. . . Mr. Burrus got up at that meeting and told the salesmen as to Mr. Wood's conversation the day before, what we intended to do; we could use that as a sales argument, they were going to make Patterson-Pope authorized dealers. He told us they were going to be made authorized dealers, and they had been giving us trouble, and they would probably give us more for a short time, but they were going to make them dealers and control them, it would be a short time before they would be broke, they were going to break them. Now, after that, I heard Perry Burrus in talking about selling a car, and about how long they were going to be in business, and how short a time Patterson-Pope was going to be in business. . . I heard him tell Captain Littell . . that their finances would not stand it in the first place, and they would not be in business over six or eight months. He said Ford would probably have to keep them a short time, and then he would be the only dealer here. I don't remember when that conversation was, but it was in 1930 sometime." On cross-examination Ansley swore: "I testified a few

minutes ago that on my trip to Atlanta, in conversation, I detailed with Mr. Burrus and Mr. Jim Wood that Perry Burrus agreed to the plan Mr. Wood outlined; that is, giving them the contract and loading them up with cars and breaking them."

C. B. Gullatt Jr. testified, that in 1930 and 1931 he was general manager of the Gullatt Motor Company, an authorized Ford dealer in Phenix City, Alabama, across the river from Columbus; that he too objected to plaintiff's selling Ford cars; and that on a certain occasion when he and Perry Burrus went to see Mr. Wood, Wood told them that "it didn't look like they could stop them, but they might make them authorized dealers and let them buy a large stock of parts and equipment, and pay out a big bunch of money, and then stop them—that was the only way to handle it."

The foregoing statement is by no means a complete resumé of the evidence in the case. It is merely designed to indicate the case made by the plaintiff in the court below. Much of the testimony adduced in behalf of the plaintiff, especially that relating to the alleged conspiracy, is contradicted by witnesses testifying for the defendants. However, we are of the opinion that there was evidence in the case from which a jury might conclude that there was a conspiracy as charged by the plaintiff. True, according to the evidence adduced in behalf of the plaintiff, Ford Motor Company originated and proposed the scheme of making plaintiff an authorized Ford dealer and breaking it, but it is also true that it might be concluded from said evidence that the insistence of Burrus Motor Company that something be done to stop plaintiff from selling Ford cars caused Ford Motor Company to propose said scheme, and that Burrus Motor Company promptly acceded to said scheme and approved of it, and that it was carried out to the injury and damage of plaintiff. "To show conspiracy it is not necessary to prove that the parties met together or entered into any specific or formal agreement, or that by words or writing they formulated their unlawful objects. Proof that two or more persons, either positively or tacitly, come to an understanding that they will accomplish an unlawful design, or a lawful design unlawfully, is sufficient." *Woodruff* v. *Hughes,* 2 *Ga. App.* 361 (3) (58 S. E. 551). "All persons who aid or advise in the commission of a fraudulent act by another, or who approve of it after it is done, for their benefit, are liable in the same manner as they would be

had they themselves performed the same act." Miller *v.* John, 208 Ill. 173 (4) (70 N. E. 27). "Conspiracy is the combination of two or more persons to do (*a*) something that is unlawful, oppressive, or immoral; or (*b*) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; (*c*) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means." *Brown* v. *Jacobs' Pharmacy Co.*, 115 *Ga.* 429, 433 (41 S. E. 553, 57 L. R. A. 547, 90 Am. St. R. 126). "A combination between dealers to drive another out of business, maliciously formed, followed by injury, is actionable." 5 R. C. L. 1095, § 44. Applying the foregoing authorities to the facts adduced in behalf of the plaintiff in the instant case, we are satisfied that a jury would have the right to conclude that the alleged conspiracy was entered into between Burrus Motor Company and Ford Motor Company.

But it is strenuously insisted, that, even though the conspiracy existed, no actionable wrong was committed—that "since Ford had the right by its express terms to cancel the contract, the motive of the cancellation, however wicked or malicious, can afford no basis of relief to Patterson & Pope." One of the principal decisions cited to sustain this contention is *Camp* v. *Ætna Insurance Co.*, 170 *Ga.* 46 (152. S. E. 41, 68 A. L. R. 1166). In that case the Supreme Court held that an insurance company might cancel a policy of fire-insurance regardless of the motive for such cancelation. In the *Camp* case the contract was entered into in good faith, and the cancelation resulted from causes that arose subsequently to its execution; while, according to some of the evidence in the instant case, the very beginning of the final wrong was the alleged conspiracy, the carrying out of which resulted in the ultimate, intended damage and injury to the plaintiff, and the contract with the cancelation clause therein was merely a convenient and effective means of accomplishing the results designed by the conspiracy. The *Camp* case, and other similar cases relied on by plaintiff in error, are distinguishable upon their facts from the case at bar, and are not, in our opinion, controlling here. We see no force in the contention that, having entered into a contract terminable at will, the plaintiff suffered no more damage than it would have incurred in the absence of the alleged conspiracy, and therefore that there was no actionable wrong. This theory appears to

presuppose that the sales contract would have been consummated regardless of the alleged fraudulent intent. We think that it might be concluded from some of the evidence that such is not the case, and that the contract would not have been entered into without such intent. The plaintiff's case is not grounded upon the cancelation of the sales contract, but rather upon means employed for the execution of a design to injure and damage the plaintiff in its business by deceitfully and fraudulently inducing it to enter a contractual relation in order to maneuver it into a position whereby the ends of the conspiracy might be accomplished. In this view of the case, the question of whether the terminable contract could be proved to have any definite or fixed value at any time is not material.

In discussing this case we fully realize that we have considered the evidence most favorably to the plaintiff, and that much of that evidence was directly contradicted. We have not intended to express any opinion as to which evidence is most credible, or as to what conclusion the jury should have reached as to any feature of the case. What has been said about evidence was solely with the view of supporting our conclusion that the verdict in favor of Burrus Motor Company was not *demanded* by the evidence, and consequently that the first grant of a new trial was not error.

*Judgment affirmed.   Broyles, C. J., and Guerry, J., concur.*